Ted Mirski, Appellee and Cross-Appellant, v. The Chesapeake and Ohio Railway Company, a Corporation, Appellant and Cross-Appellee.

Gen. No. 49,048.

First District, First Division.

October 7, 1963.

Rehearing denied October 31, 1963.

49

51

Gardner, Carton, Douglas & Chilgren, of Chicago
(Joseph P. Carr and John K. Notz, Jr., of counsel),
for appellant and cross-appellee.

H. Haskell Lurie, of Chicago (Martin F. Hauselman,
of counsel), for appellee and cross-appellant.

MR. JUSTICE MURPHY delivered the opinion of
the court.

Plaintiff sues for damages allegedly sustained by
reason of the deterioration of a carload of cherries
enroute from Yakima, Washington, to Cincinnnati,
Ohio. after a nonjury trial, the court entered judgment
against defendant for $3250. Defendant appeals,
and plaintiff cross-appeals on the sufficiency of dam-
ages awarded.

In July, 1957, plaintiff and George Joseph, who
later assigned his interest to plaintiff, purchased a
carload of cherries from Stubbs-Lamb Fruit Co. of
Yakima, Washington. The initial carrier, Union Pa-
cific Railroad, delivered refrigerator car No. PFE–
10128, built in 1957, to the shipper's warehouse early
on the morning of July 5, 1957. The car was loaded
and released that day to Union Pacific for shipment.
The car arrived in Chicago on schedule on Thursday,
July 11, 1957. Plaintiff then signed a diversion or-
der, consigning the car to his agent in Cincinnati, Ohio.
Defendant was the carrier of the car from Chicago to

Cincinnati, where it arrived on schedule at 9:40 p. m. on Friday, July 12, 1957. It was placed on a private track at the United Fruit Auction in Cincinnati by the Southern Railway Company at 9:30 a. m. on Saturday, July 13, 1957. On Monday, July 15, 1957, at 4:20 a. m., the car was opened. This was the first market day at the auction subsequent to the car's arrival in Cincinnati, and the contents were sold at auction on July 15 and July 17, 1957. Plaintiff contends that the contents of the car—1715 boxes of Bing and Lambert cherries—arrived at destination in a deteriorated and decayed condition.

Plaintiff sues defendant as "delivering carrier" of an interstate shipment of property, under the terms of the Carmack Amendment to the Interstate Commerce Act, 24 Stat 379, as amended, 49 USCA § 1 et seq. In pertinent part, the Carmack Amendment provides that:

> ". . . any common carrier, railroad, or transportation company delivering [property received for transportation from a point in one State to a point in another State] shall be liable to the lawful holder of [the bill of lading issued by the initial carrier] . . . for the full actual loss, damage, or injury to such property caused by it or by any such common carrier, railroad, or transportation company to which such property may be delivered or over whose line or lines such property may pass . . . when transported on a through bill of lading . . . : *And provided further,* That for the purposes of this paragraph . . . the delivering carrier shall be construed to be the carrier performing the line-haul service nearest to the point of destination and not a carrier performing merely a switching service at the point of destination: *And provided further,* That the liability imposed

by this paragraph shall also apply in the case of property reconsigned or diverted in accordance with the applicable tariffs filed as in this chapter provided." (34 Stat 593, as amended 44 Stat 835 and 44 Stat 1448, as amended, 49 USCA § 20(11).)

■■■■ By virtue of the Carmack Amendment, the liability of an initial or delivering carrier for damage to an interstate shipment of property is governed exclusively by Federal law (Adams Express Co. v. Croninger, 226 US 491, 505 (1913); Boston & Maine Rd. v. Hooker, 233 US 97, 110 (1914)), and decisions of the Federal courts are controlling. (Gamble-Robinson Commission Co. v. Union Pac. R. Co., 262 Ill 400, 104 NE 666 (1914).) "The purpose of the Carmack Amendment was to relieve shippers of the burden of searching out a particular negligent carrier from among the often numerous carriers handling an interstate shipment of goods" (Reider v. Thompson, 339 US 113, 119 (1950)), and this purpose is achieved by making the initial and delivering carriers liable for any loss or damage caused by a connecting carrier in the chain of transportation. In other respects, however, liability remains unchanged, and the Amendment is said to codify the common law rule "making a carrier liable, without proof of negligence, for all damage to the goods transported by it, unless it affirmatively shows that the damage was occasioned by the shipper, acts of God, the public enemy, public authority, or the inherent vice or nature of the commodity." Secretary of Agriculture v. United States, 350 US 162, 165 (1956); Chesapeake & O. Ry. Co. v. Thompson Mfg. Co., 270 US 416, 421 (1926).

■■■■ In order to make a prima facie case, all that a claimant need do is show delivery of the shipment to the carrier in good condition and delivery by the carrier to the consignee in bad condition (Thompson v. James G. McCarrick Co., 205 F2d 897, 900 (5th

54

Cir 1953); Armour Research Foundation v. Chicago, R. I. & P. R. Co., 297 F2d 176 (7th Cir 1961), 311 F2d 493 (7th Cir 1963); Harris Truck Lines, Inc. v. Cherry Meat Packers, Inc., 313 F2d 864 (7th Cir 1963)). Such a showing having been made, the carrier is liable as an insurer, without proof of negligence, unless the carrier prove one of the exceptions to absolute liability listed above, such as damage due to acts of God, the nature of the goods, etc. (United States v. Savage Truck Line, Inc., 209 F2d 442 (4th Cir 1953), cert den 347 US 952 (1954); United States Exp. Co. v. Hutchins, 67 Ill 348 (1873); Secretary of Agriculture v. United States, 350 US 162 (1956).) The liability imposed does not rest upon negligence, and the prima facie case thus made is not based upon a presumption, "since it cannot be rebutted; . . . [it is a] rule of substantive law that a carrier is liable for a failure to transport safely goods intrusted to its care, unless the loss or damage was due to one of the specified causes." Chesapeake & O. Ry. Co. v. Thompson Mfg. Co., 270 US 416, 422 (1926).

■ However, this rule is not applied with full rigor when the commodity shipped is perishable, and when the carrier's defense is that the loss occurred due to the inherent nature of the goods. Given the natural propensity of perishable goods to deteriorate with the passage of time, most courts have recognized that a quantum of evidence different from that requisite in a case involving inanimate, non-perishable goods is appropriate when the commodity shipped is perishable. As stated in Southern Pac. Co. v. Itule, 51 Ariz 25, 74 P2d 38, 41–42 (1937):

". . . in cases of the shipment of perishable fruits and vegetables, when the carrier shows affirmatively that it handled them in the method requested by the shipper, and that it exercised reasonable care to prevent any damage from any

55

cause not necessarily involved in the method of transportation so chosen, [we think] that it has satisfied the requirements of the law in regard to the quantum of proof required to establish a defense to the action, [without the necessity of proving the specific reason for the damage.]"

This qualification of the strict common law rule—which imposes absolute liability absent a carrier's specific proof of damage due to one of the excepted causes—has been followed in most of the recent cases, and has been applied in Illinois. Palmer v. Gillarde, 312 Ill App 230, 241, 38 NE2d 352 (1941); 9 Am Jur Carriers § 844 (1963 Supp, p 132); Annotation, 115 ALR 1274 (1938).

■ Defendant contends that plaintiff failed to prove the first requisite of his prima facie case—that the cherries were delivered to the initial carrier in good condition. In the case of a shipment of perishable produce, defendant argues that proof of good condition requires proof that the shipment was delivered "in a condition suitable to withstand the contemplated transportation." Principal reliance in support of this contention is placed on the case of Reuther's Seafood Co. v. Railway Exp. Agency, 71 So2d 419 (La Ct App 1954). Defendant's view would require plaintiff to prove the date (or dates) on which the cherries were picked plus the time they might reasonably be expected to keep, given their condition upon receipt by the initial carrier, the length of time the transportation would consume, and the type of protective service requested by the shipper. Absent proof as to when the cherries were picked, defendant argues that plaintiff has failed to make out a prima facie case.

We agree with plaintiff's contention that proof of delivery in good condition to the initial carrier is made by showing the grade and quality of the perish-

able fruit at the time of receipt by the carrier. Defendant's version would compel a claimant to disprove, ab initio, what is in reality a carrier's affirmative defense—that damage to a perishable shipment occurred solely as a consequence of the perishable nature of the commodity. The Reuther's Seafood case cited by defendant does not compel a different conclusion. The case involved a claim for delivery to the consignee of frozen crabmeat which was "in a bad, strong-smelling, slimy and nonedible condition." The court stated that counsel on both sides were agreed that plaintiff was required to prove delivery of the shipment "to the carrier in condition suitable to withstand the contemplated transportation." (71 So2d at 420.) Counsel being agreed, the court proceeded to apply the rule suggested. There was testimony by Reuther's president that a trade custom precluded shipment of crabmeat more than three days old, but there was no evidence adduced by Reuther to prove that the shipment in question conformed to the trade usage. The court, therefore, held that proof of good condition at delivery to the carrier had not been established. The only case cited by the Louisiana court in support of its rule as to good condition was Arwady v. Texas & N. O. R. Co., 18 So2d 339 (La Ct App 1944), which held only that reliance upon a bill of lading acknowledging receipt by the carrier of packed crates "in apparent good order," with no knowledge of the contents, was insufficient to prove delivery to the carrier in good condition.

 We conclude that the Reuther's Seafood case is insufficient authority upon which to adopt a rule at variance with the general view, and we hold that plaintiff was not required to show when the cherries in the instant case were picked, in order to make out a prima facie case.

57

██ We next consider defendant's points with respect to the sufficiency of the evidence to support the trial court's finding in plaintiff's favor. Having in mind defendant's objections to the competency of various items of evidence admitted, we consider the record in the light of the rule that a cause tried before the judge, without a jury, will not be reversed by a reviewing court for errors in the reception of evidence, if the record contains sufficient competent evidence to sustain the judgment recovered. Maton Bros., Inc. v. Central Illinois Public Service Co., 356 Ill 584, 597, 191 NE 321 (1934); Purcell v. Weasel, 12 Ill2d 356, 360, 146 NE2d 580 (1957).

██ Defendant argues that plaintiff's evidence does not support a finding that plaintiff made a prima facie case by proving delivery of the cherries to the carrier in Washington in good condition, and delivery to the consignee in Ohio in bad condition. Plaintiff's witness Gentry testified that he observed the packing and inspection of the cherries on the premises of the Stubbs-Lamb Fruit Co. warehouse in Yakima, Washington, during the entire period in which the cherries were being prepared for loading and shipment. Gentry's qualifications were sufficient for his testimony to be entitled to credence, since he had been a buyer for cherries for some twelve years. There were some discrepancies in his testimony, but it was sufficient to support a finding that the cherries that went into car PFE–10128 were delivered to the Union Pacific in good condition.

The state of the record as to the condition of the cherries when delivered at the United Fruit Auction in Cincinnati is also sufficient to support a finding of delivery in bad condition. A witness for defendant, an inspector for the Railroad Perishable Inspection Agency, testified to the presence of decay in the cherries. Plaintiff's evidence also proved bad condition in

Cincinnati, the main variance with defendant's evidence being with respect to the amount of decay present.

Defendant next contends that it carried its burden of proving either (1) that any deterioration in the carload was the result of plaintiff's own acts, for which it is not liable, or (2) that defendant complied with the shipper's directions as to protective service and proved its performance of all duties incumbent upon it as a common carrier, thus negativing any liability arising from plaintiff's prima facie case.

■■ Defendant's first point is based on the uncontroverted fact that plaintiff's agent in Cincinnati instructed the carrier not to re-ice the car at 11:30 a. m. on Saturday, July 13, 1957. The car had arrived the preceding evening at 9:40, and was to remain on the private track of the United Fruit Auction until Monday morning, July 15, 1957, when the auction would open. Defendant contends that failure to re-ice at this time was the cause of the deterioration in the cherries observed on July 15, 1957. Assuming arguendo that defendant had no duty to contact plaintiff's agent 14 hours before, when the car first arrived in Cincinnati, and further assuming that defendant had no duty upon arrival of the car in Cincinnati to check the level of ice in the car's bunkers and re-ice if necessary, it still does not necessarily follow that the cause of the deterioration of the cherries was plaintiff's agent's direction not to re-ice. This is so because there is no evidence in the record indicating that defendant iced the car from Chicago to Cincinnati. Conflicting inferences from varied items of evidence are involved, and we are not able to say, on the record before us, that defendant's evidence and the inferences reasonably to be drawn therefrom so preponderate that an opposite conclusion to that drawn by the trial court is clearly apparent. In such a case,

59

the conclusion of the trier of fact will not be disturbed. Olin Industries, Inc. v. Wuellner, 1 Ill App2d 267, 117 NE2d 565 (1954).

■ A similar conclusion is required with respect to defendant's contention that it proved its compliance with all of its duties in connection with the carriage of the carload of cherries. We agree that defendant sufficiently proved that the car was in good condition and that its equipment operated properly, and that the carriage was completed within the time appropriate for a journey from Washington to Ohio. However, the only proof as to defendant's compliance with its obligation to furnish ice with 3% salt (the protective service demanded) was defendant's answers to plaintiff's interrogatory requesting the icing record for the car. This gives no indication whether defendant iced the car between Chicago and Cincinnati, nor was there any evidence adduced by defendant tending to prove that there was no necessity for icing during this part of the transportation.

■ In relying on his prima facie case, plaintiff did not undertake to prove specific acts of negligence on defendant's part. Rather, the burden is the other way: it was incumbent upon defendant to prove that the car was iced in accordance with the requirements of standard refrigeration and of the bill of lading, and that the bunkers contained ice of the requisite amount to maintain refrigeration during the transportation. (Delphi Frosted Foods Corp. v. Illinois Cent. R. Co., 188 F2d 343 (6th Cir 1951); Southern Pac. Co. v. Itule, 51 Ariz 25, 74 P2d 38 (1937).) This burden was not met, and the trial court properly rejected the defense.

The final point we deem necessary to consider is defendant's contention that plaintiff introduced no relevant evidence of market value of cherries at destination from which could be computed the alleged loss.

■ ■ We agree with defendant that it is the burden of plaintiff to prove the amount of his loss.

60

In cases of this sort, the ordinary measure of damages is the difference between the market value of the property in the condition in which it should have arrived at the place of destination and its market value in the condition which, by reason of the fault of the carrier, it did arrive. (Gulf, Colorado & Co. Ry. v. Texas Packing Co., 244 US 31, 37 (1917); Behn v. Southern Pac. Co., 2 Ill App2d 62, 65, 118 NE2d 625 (1954).) This rule requires proof of fair cash value at the place and on the date of the contemplated sale.

It is undisputed that the cost to plaintiff of the carload of cherries was $8,333.50. Also, defendant admits that the gross proceeds of the auction sale were $5,169.-10. The trial court found the damages to be $3250. Plaintiff claimed $4,998.88 as his "full actual loss" recoverable under the Carmack Amendment, and this is the amount for which he has cross-appealed.

■ ■ The record demonstrates that plaintiff was unable to produce any direct evidence as to the fair cash market value of Bing cherries or of Lambert cherries in Cincinnati, Ohio, on July 15, 1957, in the "condition" in which they "should have arrived" at the place of destination. Therefore, to prove market value, the court permitted the introduction by plaintiff, over defendant's objections, of evidence of the alleged "closest market" (New York) and of Cincinnati "wholesale street sales" less a "jobber's customary markup," and it is on this evidence plaintiff supports his cross-appeal. We agree with defendant that the evidence in this case is insufficent to prove the "full actual loss" claimed by plaintiff. However, there is no evidence in this record to rebut plaintiff's evidence that the "lesser than purchase price" auction sale was due to the deteriorated condition of the cherries. We think the burden of proving that the lesser amount realized in the auction sale was due to a condition other than the deteriorated condition of the cherries was on defendant.

61

In arriving at $3250 as plaintiff's damages, we believe the trial court rejected plaintiff's market value evidence and used the only evidence available in the record that was not based on conjecture or hearsay, i. e., plaintiff's cost price and sale price, and arrived at a figure which, if not exact, is substantiated by evidence in the record, apparently the only certain and trustworthy evidence the case permits. (25 CJS, Damages, § 162.) It appears that a new trial would not produce any more accurate means of getting at the exact loss suffered by plaintiff. Therefore, we conclude that the amount of $3250, arrived at by the trial court as plaintiff's damages, should stand.

For the reasons stated, the judgment of the trial court is affirmed, and plaintiff's cross-appeal is denied.

Judgment affirmed and cross-appeal denied.

BURMAN, J, concurring.

ENGLISH, PJ, dissenting:

On the question of liability plaintiff's brief and the majority opinion rely on the testimony of the witness Gentry to establish the fact that the cherries were delivered to the carrier in good condition. While conceding that "there were some discrepancies in his testimony" the majority find this evidence sufficient. I do not.

Gentry was the inspector and buyer for plaintiff at the Stubbs warehouse in Yakima. He testified that his only interest there at that time was to inspect the cherries as they moved into the freight car in question. In so doing he did not look at the cherries in the car itself, but at a distance of 15 or 20 feet as they were loaded by means of a conveyor belt. There were 18 to 20 cars loaded at the Stubbs place between

June 28 and July 5, but he was interested in only the one car.

He testified further that he had first inspected cherries being loaded onto this car on June 28. He saw more cherries put into the car on June 29. He saw more on June 30 and more on July 1, and didn't know when the loading of the car was completed. He did not know the number of the car in question, but he did know that from June 28 to July 5 he was watching only one particular car being loaded.

He also said that the cherries were in good condition.

I am unable to give this testimony any credence or weight whatsoever, let alone permit it to support an essential element of plaintiff's case. I say this because the uncontroverted documentary evidence shows that the Stubbs Company did not place its order with the Union Pacific Railroad for the car in question until 5 p. m. on July 3, and at that time directed that the car be ready for loading with cherries on the morning of July 5. The record further shows that car PFE– 10128 was supplied to satisfy the Stubbs order; that this car was placed in position for loading at the Stubbs Company track at 7 a. m. on July 5, 1957; and that it was released with bill of lading signed at 6 p. m. on the same day, loaded with 1715 boxes of cherries.

Whether Gentry was merely mistaken and had watched the loading of some other car during the week commencing June 28, or whether his entire testimony was a fabrication, is of no consequence here. In any event, it is insufficient to prove delivery of cherries in good condition to the car in question.

I also find myself in agreement with defendant's contention that in cases involving inherently perishable commodities plaintiff has the burden of proving not only that the produce was delivered to the carrier

63

in good condition as of the moment of loading, but also in condition suitable to withstand the contemplated transportation.

Plaintiff stipulated that cherries are a perishable commodity. An inspector for the Railroad Perishable Inspection Agency testified that under proper refrigeration cherries must be marketed within two weeks after picking whether they are loaded onto a refrigerator car the day after picking or eight days after picking. No witness testified that any longer period could be counted on. One witness for plaintiff said that the time was variable; "four or five or fifteen days, you wouldn't know; . . . When you ship a load, you just start to pray."

It appears affirmatively that 275 boxes in the carload were picked prior to July 1, but there is no evidence as to the date of picking for the remainder. The majority would relieve plaintiff of the burden of proof in this regard, and transfer it to defendant. Under all the circumstances I consider that to be both unfair and unreasonable. I should think, rather, that plaintiff's recognized obligation to prove the good condition of his shipment at the time of loading, would be meaningless in reference to the issues here unless that "good condition" were considered to connote a condition good enough to withstand the contemplated transportation.

On the question of damages, I accept the statement in the majority opinion to the effect that "it is the burden of plaintiff to prove the amount of his loss" and that the "measure of damages is the difference between the market value of the property in the condition in which it should have arrived at the place of destination and its market value in the condition which, by reason of the fault of the carrier, it did arrive." I further agree that "[t]his rule requires proof of fair cash value at the place and on the date of the contemplated sale."

64

I cannot, however, accept the majority's departure from the stated rule. For surely it is a departure when they substitute as the measure of damages in this case the difference between plaintiff's purchase and sale prices. This error is accentuated, in my opinion, when they shift the burden of proof to defendant by concluding that "the burden of proving that the lesser amount realized in the auction sale was due to a condition other than the deteriorated condition of the cherries was on defendant."

The majority opinion seeks to justify this conclusion, admittedly at variance with the accepted rule of damages, by stating that "plaintiff was *unable* to produce any direct evidence as to the fair cash market value of Bing cherries or of Lambert cherries in Cincinnati, Ohio on July 15, 1957 in the 'condition' in which they 'should have arrived' at the place of destination." (Emphasis supplied.) While it is clear that plaintiff did not produce such evidence, I find nothing in the record to indicate that he was unable to produce it. On the contrary, the fact (formally admitted by plaintiff) was that a great abundance of cherries were marketed in Cincinnati during the week ending July 20, 1957—twice as many as during any other week in July of that year.* From this it appears

---

\* In evidence, and undisputed, is the Season Summary of the United States Department of Agriculture and the Washington State Department of Agriculture, cooperating, which reflected that carloads of cherries were delivered to Cincinnati as follows during the weeks ending on the dates set forth:

| | |
|---|---|
| June 22, 1957 | –1 |
| June 29, 1957 | –2 |
| July 6, 1957 | –1 |
| July 13, 1957 | –2 |
| July 20, 1957 | –4 |
| July 27, 1957 | –1 |
| August 3, 1957 | –0 |
| August 10, 1957 | –3 |

that it would have been impossible for plaintiff to establish that he was "unable" to submit proof of Cincinnati market value, even if he had tried to do so. And he made no such effort.

The effect of the damage formula which the majority have improvised for this case is to place upon the carrier the entire risk of variations in market price of the commodity shipped. From the footnote above it appears likely that plaintiff made an error in market judgment when he diverted the cherries in question from Chicago so that they would arrive in Cincinnati during a week of market glut. We know that, ordinarily, the free market price of any commodity is bound to decline when there is an increase in the quantity of goods to be sold to the same number of prospective buyers. Whether the market rose or fell, however, is not, and should not be made, the business risk of the railroad. Yet that is precisely what we do in this case when we excuse plaintiff from presenting evidence of the market value of cherries in good condition at Cincinnati on July 15, 1957. By the simple expedient of allowing as damages the difference between the Cincinnati auction proceeds and the plaintiff's cost of the cherries, the majority have required defendant to guarantee to the plaintiff a stability of market price not otherwise available in the marketing of perishable commodities.

As to both liability and damages I believe there has been a failure of proof, and I would, therefore, reverse the judgment of the Municipal Court.