Mr. Justice Douglas,
with whom Mr. Justice Black concurs,
dissenting.
The shipping contract in this case limited the liability of the carrier for damages in the nature of spoilage or decay to liability for negligence only. The shipping contract consists of the bill of lading and the applicable tariffs lawfully published and filed (Southern R. Co. v. Prescott, 240 U. S. 632, 637), from which there may be no departure. Id., at 638. The bill of lading provides that the goods are received, “subject to the classifications and tariffs in effect” and that every service to be performed thereunder “shall be subject to all the conditions not prohibited by law . . . including the conditions on back hereof . . . .” Its form and terms are part of Uniform Freight Classification No. 4, one of the tariffs lawfully filed and published pursuant to § 1 (6) of the Act. Classification No. 4 provides for various rates for various types of service and limits liability according to the rate paid, such limitations being held lawful by the Interstate Commerce Commission. Bills of Lading, 52 I. C. C. 671, 684 et seq.; Domestic Bill of Lading, 64 I. C. C. 357, 360-361.
Under Classification No. 4 the shipper has the option of shipping his goods either under the uniform bill of *277 lading, with a “limited liability,” or under “a common carrier’s liability.” If he chooses the latter he pays a rate 10% higher. Here the shipper chose “limited liability.” One type of limitation is a tariff that limits the amount of damages for the loss of a shipment. See, e. g., Pierce Co. v. Wells, Fargo Co., 236 U. S. 278. There the amount of recovery for negligence is allowed to be limited where the filed tariffs so provide, the shipper having the privilege of paying an increased rate and obtaining liability for the full value. Id., at 283. Here there is no question of a carrier’s being exempt from any liability caused by negligence. Rather it turns on Rule 130 and Rule 135 of the Perishable Protective Tariff No. 17, the tariff brought into play by the bill of lading.
Rule 130 states: “Carriers furnishing protective service as provided herein do not undertake to overcome the inherent tendency of perishable goods to deteriorate or decay, but merely to retard such deterioration or decay insofar as may be accomplished by reasonable protective service, of the kind and extent requested by the shipper, performed without negligence.” (Italics added.)
Rule 135 states: “Property accepted for shipment under the terms and conditions of this tariff will be received and transported subject to such directions, only, and to such election by the shipper respecting the character and incidents of the protective service as are provided for herein. The duty of the carrier is to furnish without negligence reasonable protective service of the kind and extent so directed or elected by the shipper and carriers are not liable for any loss or damage that may occur because of the acts of the shipper or because the directions of the shipper were incomplete, inadequate or ill-conceived.” (Italics added.)
These provisions were approved by the Commission (see Perishable Freight Investigation, 56 I. C. C. 449, 483), *278 the declarations being predicated upon the special hazard resulting from the perishable nature of the freight, or from the exercise by the shipper of some measure of control over the form or degree of protective service accorded.” Id., at 481.
Rules 130 and 135 are not in derogation of common-law liability which, as we said in Secretary of Agriculture v. United States, 350 U. S. 162, 165, note 9, was codified in § 20 (11) of the Act. That liability exempts the carrier only for damage caused by the shipper, acts of God, the public enemy, public authority, or “the inherent vice or nature of the commodity.” Rules 130 and 135 merely operate within the ambit of the last category, supplying appropriate standards for its application.
Such a tariff has the force and effect of a federal statute. See Southwestern Sugar & Molasses Co. v. River Terminals Corp., 360 U. S. 411. “Until changed, tariffs bind both carriers and shippers with the force of law.” Lowden v. Simonds-Shields-Lonsdale Grain Co., 306 U. S. 516, 520; Crancer v. Lowden, 315 U. S. 631, 635.
It is under Uniform Freight Classification No. 4, the bill of lading, and the Rules of the Perishable Protective Tariff that we must decide this case.
The jury found that petitioner “performed without negligence the transportation services as provided by the terms and conditions of the bill of lading and as instructed by the plaintiff and in a reasonably prudent manner as to matters not covered by the bill of lading or the plaintiff’s instructions.” The jury, however, refused to find that the damage was caused by “the inherent nature of the commodity which will cause it to deteriorate with a lapse of time.” Judgment was entered for the shipper and this Court now affirms the judgment of the Texas Supreme Court.
*279 I would reverse. In my opinion the Court should hold that a carrier of perishables overcomes the shipper’s prima facie case when he demonstrates, as here,[1] that the nature of the damage is spoilage and decay and that he performed the protective services ordered and paid for by the shipper and all other duties in a reasonably prudent manner. Any other rule nullifies the provisions of the tariff which permit the shipper to select from numerous protective services and pay the corresponding charge, and which provide that “[t]he duty of the carrier is to furnish without negligence reasonable protective service of the kind and extent so directed or elected by the shipper . . . .”
The protective service ordered by respondent when the melons were delivered to petitioner for shipment was “standard refrigeration to destination.” An expert witness explained that “ 'standard refrigeration to destination’ . . . means that the car will be reiced to capacity at all regular icing stations.” [2] Generally, the services avail *280 able for fresh fruits, vegetables, berries or melons include refrigeration with salt; standard refrigeration; initial icing only; initial icing with limited number of re-icings; half-stage refrigeration; top or body icing; cooling in car; fumigation; ventilation; and protection against cold (heater service). The “[cjharges published herein for protective service,” says the tariff, “will be in addition to and independent of all freight rates . . . .” A shipper, in other words, by paying one charge gets one service and by paying a lesser charge gets a lesser service.
In the instant case, the melons were inspected at destination by the United States Department of Agriculture. The report said:
“Condition: Generally hard to firm; white to cream color. In most samples 1 to 4 melons per crate, some none, average approximately 15% damaged by light to dark brown discoloration, some of which is sunken, occurring over y8 to y2 of surface. In most samples none, some 1 or 2 melons per crate, average approximately 3% decay, Bacterial Soft Rot, generally in advanced stages.
“Grade: Now fails to grade U. S. No. 1 only account discoloration and decay.”
*281 The defects in the melons were described by an inspector for the Railroad Perishable Inspection Agency, an organization formed by an association of carriers: [3]
“Well, light brown discoloration is actually a surface blemish of the melon. It-’s quite common to find that condition at destination markets, and we believe it’s associated with immaturity. That is, if a melon is harvested a little bit immature during the grading and packing operation, it will get very slight abrasions, and then the surface will darken.
“Bacterial Soft Rot is a decay of — it’s common decay found in many fruits and vegetables. It’s caused by an organism, bacterial organism, and it’s of field origin. The bacteria are commonly found on plant debris and that sort of thing, and it develops when the conditions of temperature and moisture are ripe for the development, bacteria-wise. You find it very commonly at destination on a great many fruits and vegetables.
“Well, the temperatures we have here would be favorable to retard that decay, because the lower the temperature you have, the more you are going to retard the development of Soft Rot.
*282 “It’s my opinion that the decay originated at shipping point, either during the harvesting or the packing operation, and that the decay developed so that it was noticeable at destination.”
The inherent weakness of perishable products and the owner’s superior familiarity with them are reflected in Rules 130 and 135 of the Perishable Protective Tariff, which, as I have said, relate the charge to the protective service desired by the shipper. The necessary protective service varies greatly for conditions sueh as those enumerated in Perishable Freight Investigation, supra, at 468:
Character of the commodity; variety of the same commodity; local climate; season when shipped; weather variations from year to year and from day to day; length of haul; condition of the commodity ; use to which it is to be put; package in which it is shipped; schedule of freight-train operation; pre-cooling of shipments; method of loading; weight loaded; character of car furnished.
And see Providence Fruit & Produce Exchange v. New York Central & Hudson R. Co., 33 I. C. C. 294, 295, 296.
Respondent could have selected any one of a wide variety of protective services, paying a higher or lower charge as the case may be. It was testified that respondent, for example, could have ordered a specified percentage of salt to be added to the icings so as to speed up the refrigeration process. Instead, for whatever reason, respondent ordered the cheaper service.
Notwithstanding this, the Court ignores the obvious difference between perishables and nonperishables and formulates a rule contrary to a valid tariff and the weight of authority.[4]
*283 As the Court of Appeals for the Ninth Circuit said, speaking through Judge Merrill: “. . . in the case of perishable goods the burden upon the carrier is not to prove that the damage resulted from the inherent vice of the goods, but to prove its own compliance with the rules of the tariff and the shipper’s instructions.” Larry’s Sandwiches, Inc., v. Pacific Electric R. Co., 318 F. 2d 690, 692-693.
In my opinion, the Court should recognize Uniform Freight Classification No. 4 and the Rules of the Perishable Protective Tariff as having the force of a statute, limiting liability to the service asked, paid for, and rendered. What we do today allows a shipper, under the guise of buying transportation service, to sell a car of produce to the railroad.

 Respondent has not seriously contended that such things as “Bacterial Soft Rot, generally in advanced stages” and “discoloration” are other than conditions of deterioration, spoilage and decay. The principal dispute at the trial centered around whether or not the shipper had in fact performed the requested services in a reasonably prudent manner, with respondent, more specifically, attempting to indicate that perhaps the refrigeration equipment was not functioning properly.

 The same expert witness discussed the various kinds of protective service available:
“Q. . . . [W] ho-dictates or orders or determines what type of service shall be furnished on a refrigerator car on a particular shipment?
“A. The shipper.
“Q. And are there various kinds of services that he can select that he can direct the railroad to furnish?
“A. Yes. The Perishable Tariff has — I wouldn’t know just how many, but perhaps a hundred different classes of service, starting with ventilation, which is no ice at all. He may ship with one icing *280 only, initial icing, Rule 240. He may start with two icings, three and four. With standard icing- — which is icing at all regular icing stations — he, in addition to that, can specify salt, if he wants to, certain percentage of salt, which is supposed to step up the meltage and refrigeration. There are a hundred classes of service from which the shipper dictates what he thinks, in his opinion, will best protect his shipment.”
Details on the numerous protective services available are contained in Perishable Protective Tariff 18, Local, Joint and Proportional Charges and Rules and Regulations Governing the Handling of Perishable Freight, National Perishable Freight Committee, I. C. C. 37 (1960).

 The only contradictory testimony came from respondent’s office manager who, after stating on cross-examination that he would not attempt any opinions about “decay and sunken areas and discoloration or things like that,” said on redirect examination:
“Q. Have you developed in your experience in this business over seventeen years a general knowledge of what causes the decay in some instances ?
“A. Yes. Improper refrigeration, I would say.”

 See Mirski v. Chesapeake & Ohio R. Co., 44 Ill. App. 2d 48, 194 N. E. 2d 361; Trautmann Bros. Co. v. Missouri Pac. R. Co., 312 F. 2d 102 (C. A. 5th Cir.); and Larry’s Sandwiches, Inc., v. Pacific Elec. R. Co., 318 F. 2d 690 (C. A. 9th Cir.).