628

**Anthony J. SARNO, d/b/a Sunlight Tomato Repacking Company, Plaintiff,**

v.

**SOUTHERN PACIFIC COMPANY, Defendant.**

**Civ. A. No. 66–666.**

United States District Court
D. Massachusetts.

Dec. 12, 1967.

Frank Infelise, Infelise & Strout, Lynn, Mass., for plaintiff.

George B. Redding, Charles S. Adams, Boston, Mass., for defendant.

OPINION

JULIAN, District Judge.

The plaintiff, Anthony J. Sarno, brought this suit under the Interstate Commerce Act as the consignee of a uniform straight bill of lading against the Southern Pacific Company, a railroad corporation engaged in interstate commerce. Recovery was sought against the defendant as a receiving carrier within the meaning of 49 U.S.C. § 20(11) for loss suffered by the plaintiff as the result of damage inflicted in transit to a shipment of tomatoes covered by the bill of lading.

The case was tried by the Court sitting without a jury.

*Findings of Fact*

The plaintiff, Anthony J. Sarno (hereinafter referred to as "Sarno"), does

business in Boston, Massachusetts, under the name "Sunlight Tomato Repacking Co." The defendant is a railroad corporation engaged in interstate commerce.

On July 2, 1963, the defendant, Southern Pacific Company (hereinafter referred to as "Southern Pacific"), received a shipment of tomatoes at Merced, California, from Sarno's consignor, Central California Tomato Growers Coop., Inc. On that date Southern Pacific issued a uniform straight bill of lading covering railroad car number PFE–20889. The bill of lading, on its face, indicated that it covered 828 forty-three-pound packages of "mature green tomatoes" destined for delivery to the plaintiff in Boston, Massachusetts.

An official inspection was conducted on July 1 and 2, 1963, during the period of loading by an inspector of the United States Department of Agriculture and the State of California Department of Agriculture. The inspector graded the tomatoes as grade "U.S. No. 2" and so certified in his inspection certificate (Exh. 2), further adding the remarks: "Defects average within tolerance" and "Meets size as marked." The Court finds that the tomatoes were in fact grade "U.S. No. 2" and in good condition when delivered to the defendant carrier.

The description "defects average within tolerance" meant, according to the

Department of Agriculture's prescribed tolerance levels *at shipping points,*[1] that no more than 10 percent of the tomatoes contained described defects, that no more than 5 percent had defects causing very serious damage, and that no more than 1 percent were soft or decayed.

The "Tempco" railroad car in question was equipped at one end with a single bunker capable of holding 7,400 pounds of ice which, together with fans, served to maintain a reduced temperature throughout the car.

The bunker had been filled at 4:00 p. m. on June 30, 1963, at Fresno, California, prior to its delivery to the shipper-consignor at Merced at 7:00 a. m. the following morning, July 1, for loading. The car, filled with 17½ tons of tomatoes, was returned to Southern Pacific on July 2, at 6:00 p. m., at which time the bill of lading issued and the car began its cross-country trek.

Seven thousand pounds of ice were added at 4:00 the following afternoon at Roseville, California, and an additional 6,500 pounds were supplied three days later, on July 6, 1963, at Council Bluffs, Iowa.

Plaintiff Sarno, who had in advance designated all "re-icings" en route,[2] cancelled a scheduled "re-icing" in Chicago after conferring with his representative there concerning the condition of the car

---

1. The grade "U.S. No. 2," as defined by the Agricultural Marketing Service of the United States Department of Agriculture, 7 CFR § 51.1857,

    "consists of tomatoes of similar varietal characteristics which are mature but not overripe or soft, which are clean, well developed, reasonably well formed, which may be slightly rough, and which are free from decay, freezing injury and sunscald, and free from serious damage caused by bruises, cuts and broken skins, internal discoloration, sunburn, puffiness, catfaces, other scars, growth cracks, hail, insects, disease, or mechanical or other means.

    "(a) *Tolerances.* In order to allow for variations incident to proper grading and handling the following tolerances shall be permitted:

    "(1) At shipping point * * * not more than a total of 10 percent, by

    count, for tomatoes in any lot which fail to meet the requirements of this grade: *Provided,* That not more than 5 percent, shall be allowed for defects causing very serious damage, and including in this latter amount not more than 1 percent for tomatoes which are soft or affected by decay * * *."

    * * * * *

2. Sarno testified that he instructed the shipper concerning re-icing en route 99 percent of the time, based on his 33 years of experience in the industry and his knowledge of reports of climatic and crop conditions in the growing area. In 1963 alone he ordered approximately 450 carloads of tomatoes from various growing areas, about 85 of these being carloads of tomatoes shipped from the Merced area during the summer months.

at that point. After a 41-hour delay in Chicago, the car proceeded to Huntingdon, Pennsylvania—a distance of approximately five hundred miles—where, pursuant to Sarno's amended instructions, an additional 2,000 pounds of ice were added on July 9, 1963.

The car arrived in Boston and was delivered to an unloading siding on the auction floor of H. Harris & Co., Inc., during the early morning hours of July 11, 1963—nine days after being delivered to Southern Pacific. At the time of arrival both the air temperature inside the car and the actual "pulp temperature" of the tomatoes themselves were, in the opinion of experts called by both parties, "ideal." [3] The tomatoes were still 75 percent mature green, with an additional 20 percent turning ripe, and 5 percent "firm ripe." [4]

The condition of the tomatoes upon arrival, however, was such that they no longer met the requisite standards for grade "U.S. No. 2," even under the increased tolerance levels prescribed for such a grade while the fruit is en route or at shipping point.[5] Inspection of the unloaded car revealed that the entire 17½-ton load had shifted from one end to the other a distance ranging from one to five inches. Some crates on the lowest layer were crushed, and at least 15 broken crates were visible prior to unloading, indicating rough handling.

During the unloading process, at which time the crates were carried a distance of not more than twenty feet, 77 crates were discovered to require recoopering attention. Of these only 30 crates could be made good. The additional 47 damaged crates were set aside. There was no evidence to suggest rough handling during unloading.

Inspection of the tomatoes themselves revealed substantial defects which, in combination, prevented their qualifying as "U.S. No. 2." Four percent were "puffy," a condition of retarded cell development caused usually by excessive moisture while the fruit is growing. Three percent of the tomatoes showed stem and rot decay, a factor which develops only after harvesting and which can be caused by rough handling in shipping. One percent of the fruit evidenced "late blight," a field condition not attributable to rough handling in transportation.

Between eight and ten percent of the tomatoes revealed sunken and discolored areas at the shoulders, a condition stemming from bruising either during harvesting or in shipping.

Seven percent of the tomatoes showed soft and translucent [6] areas ranging from one-half to two inches in diameter.

Three percent of the shipment showed "pack bruising," a condition possibly

---

3. Sarno had prescribed a thermostatic setting of 58° F. at the outset of the journey. Upon arrival in Boston the car's interior air temperature was 59° F. at the top of the load and 57° at the bottom. The thermostat at that time was set at 60°.

4. This was confirmed substantially by both the railroad inspector and an independent inspector engaged by Sarno.

5. 7 CFR § 51.1857(a) (2) prescribes the following tolerances at destination:
   "(2) En route or at destination, not more than a total of 15 percent, by count, for tomatoes in any lot which fail to meet the requirements of this grade: *Provided*, That included in this amount not more than the following percentages shall be allowed for the defects listed:
   5 percent for tomatoes which are soft or affected by decay;

10 percent for tomatoes which are seriously damaged by shoulder bruises or by discolored or sunken scars on any parts of the tomatoes, and 10 percent for tomatoes which are otherwise defective: *Provided*, That not more than a total of 5 percent shall be allowed for tomatoes which are very seriously damaged by any cause, exclusive of soft or decayed tomatoes."

6. "Translucency," which renders that part of the fruit useless, is a glasseous area which, on green tomatoes, appears very dark. On riper tomatoes the area is dark and watery. Sarno's expert witness, Costa Caraganis, whose expertise in the field of olericulture is extensive, and whose testimony I find reliable, testified that this condition is a product of bruising.

caused by rough handling in transit. And nine percent of the tomatoes revealed serious scars and blemishes, a condition unlikely to have been caused by rough handling during shipping.

There is no dispute in this case that the tomatoes were not, upon arrival in Boston, "U.S. No. 2." Plaintiff's expert witness testified that the conditions found upon the shipment's arrival in Boston were, in his opinion, caused by rough handling in transit.

█ I find as a fact that rough handling by the carrier was the cause of the tomatoes' being thrown "out of grade" upon delivery in Boston, and that if reasonable precautions had been taken by the carrier the tomatoes would have arrived in Boston as grade "U.S. No. 2." I further find as a fact that the manner of icing and subsequent re-icing of the car, on the circumstances of this case, was not a causative factor in the shipment's falling below grade upon arrival. I also find that the subgrade condition of the tomatoes upon arrival was not caused by any inherent vice or nature of the goods or by any act of Sarno or Sarno's consignor.

Both parties agree that, as a result of the damage to this shipment of tomatoes,[7] defendant Southern Pacific, if liable at all, is liable in the amount of $1,607.85, and this Court so finds as a matter of fact.

### Conclusions of Law

█ Defendant Southern Pacific, as a common carrier, owed a duty to plaintiff, as a shipper, to exercise reasonable care in the handling of this shipment and to perform all required transportation services without negligence.

█ The Carmack Amendment of 1906,[8] section 20(11) of the Interstate Commerce Act, 49 U.S.C. § 20(11), rendered carriers liable "for the full actual loss, damage or injury * * * caused by" them to property they transport. Any contract, regulation, tariff, or other attempted means of limiting this liability was declared void. Thus a carrier, although not an absolute insurer, stands liable for damage to goods which it transports unless it can show its freedom from negligence and that the damage was caused by an Act of God, acts of a public enemy, public authority, an act of the shipper, or an inherent vice or the nature of the goods. See Missouri Pac. R.R. Co. v. Elmore & Stahl, 1964, 377 U.S. 134, 137, 84 S.Ct. 1142, 12 L.Ed.2d 194, rehearing denied, 1964, 377 U.S. 984, 84 S.Ct. 1880, 12 L.Ed.2d 752, and the cases there cited.

Plaintiff established a prima facie case by showing

"delivery [to the carrier] in good condition, arrival in damaged condition, and the amount of damages. Thereupon, the burden of proof [was] upon the carrier to show both that it was free from negligence and that the damage to the cargo was due to one of the excepted causes relieving the carrier of liability." Id. 377 U.S. at 138, 84 S.Ct. at 1145.

This Court concludes that plaintiff established a prima facie case. The Court further concludes that defendant Southern Pacific failed to show by a preponderance of the credible evidence either its freedom from negligence or that the damage resulted from any of the mentioned excepted causes.

The Court therefore holds that defendant is liable to plaintiff in the amount of $1,607.85, plus interest and costs.

Judgment will be entered accordingly.

---

7. Forty-seven crates were the subject of a separate proceeding between the parties and are not here considered.

8. 34 Stat. 595.