**George CONDAKES, doing business as Peter Condakes Company, Plaintiff,**

**v.**

**SOUTHERN PACIFIC COMPANY, Defendant.**

**Civ. A. No. 66–877–J.**

United States District Court
D. Massachusetts.

Dec. 17, 1968.

Frank Infelise, Lynn, Mass., for plaintiff.

George B. Redding, and Earl F. Nauss, Jr., Boston, Mass., for defendant.

## OPINION

JULIAN, District Judge.

The plaintiff, George Condakes, brought this suit under the Carmack Amendment to the Interstate Commerce Act as the consignee of a uniform straight bill of lading against Southern Pacific Company, a railroad corporation engaged in interstate commerce. Recovery is sought against defendant as a receiving carrier within the meaning of 49 U.S.C. § 20(11) for loss allegedly suffered by plaintiff as the result of damage inflicted to a carload shipment of grapes covered by the bill of lading during transit from Serape, Arizona, to Boston.

## FINDINGS OF FACT

The plaintiff, George Condakes (hereinafter referred to as "Condakes"), does business as a wholesale distributor of fresh produce at Boston, Massachusetts, under the name Peter Condakes Company. The defendant (hereinafter referred to as "Southern Pacific") is a railroad corporation engaged in interstate commerce.

On July 2 or 3, 1963, Southern Pacific received a carload shipment of grapes at Serape, Arizona, from the consignor, Joe Macciaroli, and issued a uniform straight bill of lading covering the refrigerated car in question (PFE–8213). The shipment consisted of 1,080 twenty-seven-pound lugs of Thompson Seedless table grapes bearing the brand name "JoMac."

An official inspection was conducted at the point of shipment, Serape Siding, Arizona, on July 1 and 2, 1968, by an inspector of the United States Department of Agriculture. The tolerance levels for grade "U.S. No. 1 Table" grapes then in effect pursuant to United States Department of Agriculture regulation, 7 C.F.R. § 51.882(c) (1) (ii), provided that not more than 2 per cent of the berries could be "seriously damaged." The Government inspector certified "Defects within Tolerance" and graded the shipment "U.S. No. 1 Table" grapes. I find that the grapes were, in fact, grade "U.S. No. 1 Table" and in good condition when delivered to Southern Pacific.

While the shipment was in transit eastward, a broker in Chicago acting on behalf of the shipper consigned the shipment to plaintiff in Boston. The parties have stipulated and I find that plaintiff is a proper party to bring suit under the bill of lading.

The shipment arrived at Boston and was delivered to plaintiff at the Boston Market Terminal at about 3:50 A.M. on July 12, 1963, in time for that morning's market.

The condition of the grapes upon arrival, however, was such that they no longer met the requisite standards for grade "U.S. No. 1 Table." Inspection of the car immediately upon arrival revealed that the entire 16½- to 17-ton load had shifted from one end of the car to the other a distance ranging from one to two inches.

During the unloading process, 55 lugs were found to require recoopering attention, and the grapes adjacent to the damaged portion of those lugs had to be replaced. The shifting of the load and the high percentage of crates requiring recoopering both indicated rough handling of the carload during transit.[1]

Inspection of the grapes themselves revealed that some of them were "wet," in percentages ranging from 3 to 12 per cent per lug, with most lugs containing between 5 and 7 per cent "wet" grapes. The term "wet," which was and is a form

---

1. This was the testimony of Condakes' expert witness, Costis Caraganis, whose expertise in the field of olericulture is extensive and whose testimony I find reliable.

of "serious damage" under Government grading standards,[2]

> "means that the grapes are wet from moisture from crushed, leaking or decayed berries or from rain. Grapes which are moist from dew or other moisture condensation such as that resulting from removing grapes from a refrigerator car or cold storage to a warmer location shall not be considered as wet." 7 C.F.R. § 51.894.

I find as a fact that the "wet" grapes in this shipment were "wet" within the foregoing definition and that they were not moist from any form of moisture condensation. I find that the "wet" condition of the grapes was caused by rough handling of the shipment during transit and not by any inherent vice or defect in the grapes or by any act of Condakes or the shipper. I further find that if reasonable care had been taken by the defendant carrier and the connecting carriers the grapes would have arrived at Boston as grade "U.S. No. 1 Table."

Upon completion of the recoopering process, nine of the 1,080 lugs were rejected to auction as "bad order" lugs,[3] and Condakes was compensated for these by the shipper as is the custom in the industry.[4] The remaining 46 crates were repaired and the damaged grapes therein were replaced, thus making the lugs comparable to the other lugs in the shipment. The 1,071 lugs were actually sold on July 12 for $3,760.32, which I find to have been the fair market value of the grapes in their actual condition upon arrival. Had the grapes, upon arrival, been grade "U.S. No. 1 Table," the fair market value of the 1,071 lugs would have been $6.25 per lug, or $6,693.75.[5] Accordingly, I find that plaintiff suffered a loss, as a result of rough handling of the shipment, in the amount of $2,933.43.

2. 7 C.F.R. § 51.906 provided as follows:
" 'Serious damage' means any defect which seriously affects the appearance, or the edible or shipping quality of the grapes and includes berries which are split, crushed, wet, affected by decay or waterberry, or damaged by heat or freezing, except that raisining grapes that are cracked or split, and grapes which show healed cracks at the blossom end shall not be considered as seriously damaged."

3. "Bad order" lugs are those which either (1) are so badly broken and contain fruit so badly damaged that they cannot be sold on the regular market as "good order" lugs, or (2) contain damaged fruit removed from other lugs in the recoopering process.

4. See Sarno v. Southern Pacific Co., 1967, D.Mass., 277 F.Supp. 628, 631, n. 7.

5. This was the unrebutted testimony of plaintiff, who based his opinion upon his own expert knowledge of the market value of grapes and upon the U. S. Department of Agriculture's daily market reports (Exhs. D and E). Neither the report for July 11 nor the report for July 12, 1963, contained quotations for grapes of the exact type, condition and quality of those in this shipment had it arrived in the same condition as shipped—Arizona Thompson Seedless Grapes, with small to medium sized berries, in 27-lb. lugs bearing a leading "mark," or brand name [JoMac], graded "U.S. No. 1 Table" in quality.

However, the market in grapes remained "about steady" for both days (Exh. E), and the prices of comparable shipments of all types of grapes from both California and Arizona were roughly similar on both days.

Accordingly, plaintiff used the only quotation for either of those days which concerned Thompson Seedless grapes of good quality and bearing a good mark. That was the quotation for July 11 dealing with good quality Thompson Seedless grapes from California (rather than Arizona) in 24-lb. (rather than 27-lb.) lugs. That quotation was:

"best marks 6.50–7.00 mos[tly] 6.50–6.75 [small number] 5.50–6.00."
The choice of the figure $6.25, therefore, is fair. It is noted that plaintiff does not seek a larger amount because this shipment involved 27-lb. lugs.

The Court finds this evidence sufficient to carry plaintiff's burden of proof, especially in view of Condakes' extensive experience in the trade and in view of the absence of contrary evidence. In this latter regard it is significant that defendant called as a witness the Department of Agriculture's Fruit and Vegetable Market Reporter for the Boston Market, who supervised the preparation of the market reports, but did not question him regarding the fair market value of the grapes.

Plaintiff filed a timely claim for damages with the defendant. As was, and is, plaintiff's practice and the practice of many of plaintiff's competitors, the claim was filed by the National Freight Traffic Service (hereinafter "N.F.T.S."), which periodically reviews all of plaintiff's files to determine whether claims should be filed for any shipments. N.F.T.S. then proceeds as the consignee's authorized agent to file such claims with the carriers, to conduct settlement conferences with the carrier's representatives, and to settle claims.

The unrebutted evidence in this case is, and I find, that N.F.T.S. did not, and does not, consult its principals, including Condakes, before determining the amount to be claimed nor before settling claims. The amount actually claimed, in this case $504,[6] was based upon a different set of considerations than would be advanced as the basis for recovery in a court of law,[7] and was not relied upon by either N.F.T.S. or the carrier in settlement discussions.[8] The amount of the settlement depends upon considerations developed in the course of the negotiations, and may be the same, larger or smaller than the amount stated in the claim.

Accordingly, I find that the amount claimed to have been lost, as indicated on the freight claim, is not persuasive evidence of the actual amount of Condakes' damage.

## CONCLUSIONS OF LAW

■ Defendant, Southern Pacific, as a common carrier, owed a duty to plaintiff to exercise reasonable care in the handling of this shipment and to perform all required transportation services without negligence. As this Court recently held in Sarno v. Southern Pacific Company, 1967, D.Mass., 277 F.Supp. 628, 631:

"The Carmack Amendment of 1906, section 20(11) of the Interstate Commerce Act, 49 U.S.C. § 20(11), rendered carriers liable 'for the full actual loss, damage or injury * * * caused by' them to property they transport. Any contract, regulation, tariff, or other attempted means of limiting this liability was declared void. Thus a carrier, although not an absolute insurer, stands liable for damage to goods which it transports unless it can show its freedom from negligence and that the damage was caused by an Act of God, acts of a public enemy, public authority, an act of the shipper, or an inherent vice or the nature of the goods. See Missouri Pac. R.R. Co. v. Elmore & Stahl, 1964, 377 U.S. 134, 137, 84 S.Ct. 1142, 12 L.Ed.2d 194, rehearing denied, 1964,

6. Plaintiff's witness, Cataldo, the head of N.F.T.S., testified, and I find, that the amount claimed in this case was based upon a price of 50 cents per lug. Fifty cents multiplied by 1,080 lugs is $540. I find that the figure $504 appearing on the actual freight claim (Exh. 6) was a typographical error.

7. Cataldo testified that, although the file in this case reflected that Condakes had suffered a loss because of "wet" berries, the carriers' long-standing practice was never to settle claims on that basis. For that reason the claim actually submitted was not based upon any alleged loss caused by deterioration in the condition of the grapes. Instead, the claim was based upon an alleged loss caused by delay in delivery (not pressed at the trial) and was predicated upon a decline of 50 cents (from $3.25 per lug on July 11 to $2.75 per lug on July 12) in the market price per lug of Arizona Thompson Seedless grapes of fair-to-ordinary quality and poor condition.

8. This evidence of the custom in the trade, while different from what one might normally expect in the usual and ordinary conduct of commercial relations between men of business, is at least partially explained by the understandable reluctance with which persons engaged in this particular industry undertake litigation. The Court notes the absence of rebuttal testimony, particularly where the defendant's claims adjuster, McDowell, who actually conducts the settlement negotiations of such claims with Cataldo, was present in the courtroom, heard the testimony, but was not called as a witness by the defendant to rebut Cataldo's testimony.

377 U.S. 984, 84 S.Ct. 1880, 12 L.Ed.2d 752, and the cases there cited."

■ Plaintiff established a prima facie case by showing delivery of the goods to the carrier in good condition, their arrival in damaged condition, and the amount of damages. At that point the burden of proof shifted to defendant to show not only that it was free from negligence but also that the damage to the cargo was attributable to one of the exceptional conditions outlined above. Missouri Pac. R.R. Co. v. Elmore & Stahl, *supra*.

■ This Court concludes that plaintiff established a prima facie case. There is no merit in defendant's contention that the United States Department of Agriculture origin Inspection Certificate is insufficient evidence that the grapes in question were in good condition upon delivery to the carrier. Plaintiff is not required

> "to disprove, *ab initio*, what is in reality a carrier's affirmative defense —that damage to a perishable shipment occurred solely as a consequence of the perishable nature of the commodity."

Mirski v. Chesapeake and Ohio Ry. Co., 1963, 44 Ill.App.2d 48, 194 N.E.2d 361, 365; *accord*, see opinion of Justice Schaefer dealing with this issue on appeal but reversing on other grounds. Mirski v. Chesapeake and Ohio Ry. Co., 1964, 31 Ill. 423, 202 N.E.2d 22. To require plaintiff, in order to prove good condition, to disprove the existence of all hypothetical defects in the goods would effectively emasculate the rule set forth in Missouri Pac. R.R. Co. v. Elmore & Stahl, *supra*, and would make recovery in cases of this type virtually impossible. In any event, the effect—if any—of the deposition testimony of Van Osdel, the *government inspector at point of origin*, which was introduced by defendant, is to buttress the evidentiary value of the official point-of-origin Inspection Certificate.

The Court concludes that defendant Southern Pacific failed to show by a preponderance of the credible evidence either its freedom from negligence or that the damage to the grapes resulted from any of the mentioned excepted causes.

The Court therefore holds that defendant is liable to plaintiff in the amount of $2,933.43, plus interest and costs.

Judgment will be entered accordingly.