### M & S TOMATO REPACKING COMPANY, Plaintiff,
### v.
### BOSTON AND MAINE CORPORATION, Defendant.

#### Civ. A. No. 68–708.

United States District Court,
D. Massachusetts.
March 26, 1970.

Francis J. Ulman, Boston, Mass., for plaintiff.

John E. Keefe, Boston, Mass., for defendant.

## OPINION

JULIAN, District Judge.

The plaintiff, M & S Tomato Repacking Company, brought this suit under the Carmack Amendment to the Interstate Commerce Act, 49 U.S.C. § 20(11), as the consignee of a uniform, nonnegotiable, straight bill of lading against Boston and Maine Corporation, a railroad corporation engaged in interstate commerce. Recovery is sought against defendant as a receiving carrier within the meaning of 49 U.S.C. § 20(11) for loss allegedly suffered by plaintiff as the result of damage to a vanload shipment of tomatoes covered by the bill of lading during transit from Crows Landing, California, to Springfield, Massachusetts. The damage is alleged to have been caused by excessive chilling in transit.

### Findings of Fact

The plaintiff, M & S Tomato Repacking Company, is a Massachusetts corporation having a usual place of business in Springfield, Massachusetts, and engaged in the business of repacking tomatoes and selling tomatoes at wholesale. Defendant, Boston and Maine Corporation, is a Delaware corporation operating the Boston and Maine Railroad.

On October 15, 1965, Perez Brothers, a California grower and shipper of fruits and vegetables, shipped to the plaintiff trailer # WPZ 50717 containing 947 forty-pound cartons of mature green tomatoes. The van was shipped piggyback from Crows Landing, California, to the plaintiff's place of business, Springfield, Massachusetts, through Best's Express. The tomatoes were inspected at Crows Landing by the United States Department of Agriculture and found to be "U.S. No. 1" with no decay. I adopt this finding.

At 9:30 p. m., October 15, 1965, Best's Express tendered trailer # WPZ 50717 to the Western Pacific Railroad at Stockton, California. It was loaded on Car WP 1710 consigned to the plaintiff and covered by a uniform straight bill of lading issued by the Western Pacific Railroad. The bill of lading specified that the tomatoes were to be transported at a temperature of 54°. The shipment arrived at Springfield without delay in transit; the trailer was unloaded from the flatcar on October 21, 1965. The plaintiff released trailer # WPZ 50717 to the defendant on October 23, 1965, after unloading.

The tomatoes showed no sign of damage on arrival in Springfield. They were placed in plaintiff's ripening rooms, marked with the shipper's name and date of receipt. Commencing October 26, 1965, and continuing through November 8, 1965, plaintiff dumped or disposed of as garbage almost the entire shipment of tomatoes. The tomatoes

either did not ripen or ripened with decay. Three to five per cent of the tomatoes were repacked and sent to customers. However, plaintiff received complaints about these tomatoes and refunded the purchase price. I find that the shipment was a total loss.

On October 26, 1965, Simon Posnick, a shareholder, member of the board of directors, and treasurer of plaintiff, telephoned the Boston and *Albany* Railroad to protest the condition of the tomatoes. On November 2, 1965, Mr. Posnick made a written protest to the Boston and *Albany* Railroad. On November 5, 1965, an Inspector for the Railroad Perishable Inspection Agency, at the request of the Boston and Maine Railroad, inspected the tomatoes remaining in plaintiff's ripening rooms. He found the ripening room temperature to be 58°, and the vast majority of the tomatoes to be either green or decaying. I adopt these findings.

To substantiate its claim that the tomatoes were chilled in transit, plaintiff produced a witness, qualified as an expert by this Court, and a United States Department of Agriculture document on the proper temperatures at which tomatoes should be shipped. Defendant produced, as an expert, an Inspector for the Railroad Perishable Inspection Agency. I find the testimony of plaintiff's witness to be persuasive. On the basis of his testimony and of the other evidence in the case I find as follows. Tomatoes are shipped while green and ripen both in transit and in the repacker's ripening rooms. For tomatoes to ripen properly, the temperature must be strictly regulated. Best results are obtained at temperatures between 55° and 65°; the most decay and poorest ripening occur in tomatoes that have been chilled at temperatures below 50°. The lower the temperature and the longer the time below 50°, the more decay. Damage caused by chilling is not ap-

parent until several days after the tomatoes are placed in ripening bins.

When tomatoes are exposed to temperatures below 50°, a fungus, *alternaria tenuis*, usually develops. *Alternaria tenuis*, called alternaria rot, can only enter tomatoes when they are chilled or through growth cracks. Alternaria weakens tomatoes; secondary defects usually develop in weakened tomatoes.

In this case there is no direct evidence that the tomatoes were subjected to low temperatures. However, the clear and unmistakable inference of all the credible circumstantial evidence is that the tomatoes were subjected to temperatures below 50° for a prolonged period during transit. I find this as a fact.

Prior to the commencement of the shipping, the tomatoes were grade U.S. No. 1, which is defined by the Department of Agriculture as follows:

" 'U.S. No. 1' consists of tomatoes of similar varietal characteristics which are mature but not overripe or soft, which are clean, well developed, fairly well formed, fairly smooth, and which are free from decay, *freezing injury* and sunscald, and free from damage caused by bruises, cuts and broken skins, internal discoloration, sunburn, puffiness, catfaces, other scars, *growth cracks*, hail, insects, disease, or mechanical or other means." (Emphasis added.)

7 C.F.R. § 51.1855 (1969). Since alternaria rot is caused by chilling or by growth cracks, and since these tomatoes were free from injury caused by excessive chilling and damage caused by growth cracks, they must have developed alternaria through exposure during transit to excessively low temperatures.[1]

Plaintiff filed a written notice of claim on March 5, 1966, with the Western Pacific Railroad, which claim was disallowed.

---

1. There is also strong circumstantial evidence because a second trailer of U.S. No. 1 tomatoes, shipped by Perez Brothers at the same time as trailer #WPZ 50717, ripened with only normal spoilage.

To prove the fair market value of U.S. No. 1 tomatoes, plaintiff introduced the Boston Fruit Auction Report for October 21, 1965.[2] It is stipulated that the disputed shipment contained:

95 cartons of 5 x 6 tomatoes
402 cartons of 6 x 6 tomatoes
450 cartons of 6 x 7 tomatoes

For U.S. No. 1 tomatoes of these sizes the Boston Market prices were:

5 x 6 tomatoes — none sold
6 x 6 tomatoes — $6.50 per carton
6 x 7 tomatoes — $6.45 per carton

A fair price for 5 x 6 tomatoes is $6.75 per carton, determined by adding the difference in the invoice price between 5 x 6 tomatoes and 6 x 6 tomatoes to the Boston Market price of $6.50 per carton for 6 x 6 tomatoes.

### Conclusions of Law

Defendant is a carrier and a delivering carrier within the meaning of the Carmack Amendment, 49 U.S.C. § 20(11).

Plaintiff filed its claim and commenced this action within the applicable time limitations.

■ Plaintiff by acceptance of the shipment did not waive its rights to recover for concealed damage.

■ Defendant, as a common carrier, owed a duty to plaintiff to exercise reasonable care in the handling of this shipment and to perform all required transportation services without negligence. As this Court has held:

"The Carmack Amendment of 1906, section 20(11) of the Interstate Commerce Act, 49 U.S.C. § 20(11), rendered carriers liable 'for the full actual loss, damage or injury * * * caused by' them to property they trans-port. Any contract, regulation, tariff, or other attempted means of limiting this liability was declared void. Thus a carrier, although not an absolute insurer, stands liable for damage to goods which it transports unless it can show its freedom from negligence and that the damage was caused by an Act of God, acts of a public enemy, public authority, an act of the shipper, or an inherent vice or the nature of the goods."

Sarno v. Southern Pacific Co., 1967, D. Mass., 277 F.Supp. 628, 631.

■ Plaintiff established a prima facie case by showing delivery of the goods to the carrier in good condition, their arrival with concealed damage, and the amount of damages. At that point the burden of persuasion shifted to defendant to show not only that it was free from negligence but also that the damage to the cargo was attributable to one of the exceptional circumstances outlined above. See Missouri Pac. R.R. Co. v. Elmore & Stahl, 1964, 377 U.S. 134, 137, 84 S.Ct. 1142, 12 L.Ed.2d 194, rehearing denied, 1964, 377 U.S. 984, 84 S.Ct. 1880, 12 L.Ed.2d 752.

■ This Court concludes that plaintiff established a prima facie case. Further, the defendant railroad failed to show by a preponderance of the credible evidence either its freedom from negligence or that the damage to the tomatoes resulted from any of the mentioned excepted causes. In fact, defendant failed to adduce *any* evidence tending to prove that the temperature during transit was maintained at a proper level.

The Court finds the defendant liable to the plaintiff and assesses damages in the amount of $6,156.75, plus interest and costs.

Judgment will be entered accordingly.

2. There was uncontradicted testimony that there was no wholesale market for tomatoes in Springfield. Boston was the closest market to Springfield.