377 U.S. 134 (1964)
MISSOURI PACIFIC RAILROAD CO.
v.
ELMORE & STAHL.
No. 292.
Supreme Court of United States.
Argued March 3, 1964.
Decided May 4, 1964.
CERTIORARI TO THE SUPREME COURT OF TEXAS.
Thurman Arnold argued the cause for petitioner. With him on the briefs were Abe Fortas, Abe Krash and Dennis G. Lyons.
*135 John C. North, Jr. argued the cause and filed a brief for respondent.
Gregory S. Prince, William M. Moloney and J. Edgar McDonald filed a brief for the Association of American Railroads, as amicus curiae, urging reversal.
Michael C. Bernstein and William Augello, Jr. filed a brief for the United Fresh Fruit & Vegetable Association et al., as amici curiae, urging affirmance.
MR. JUSTICE STEWART delivered the opinion of the Court.
The question presented in this case is whether a common carrier which has exercised reasonable care and has complied with the instructions of the shipper, is nonetheless liable to the shipper for spoilage in transit of an interstate shipment of perishable commodities, when the carrier fails to prove that the cause of the spoilage was the natural tendency of the commodities to deteriorate. The petitioner is a common carrier and the respondent is a fruit shipper. The respondent sued the petitioner in a Texas court to recover for damage to a carload of honeydew melons shipped from Rio Grande City, Texas, to Chicago, Illinois.[1]
In accordance with Texas practice, special issues were submitted to the jury at the close of the evidence. The jury affirmatively found that the melons were in good condition at the time they were turned over to the carrier in Rio Grande City, but that they arrived in damaged condition at their destination in Chicago. The jury also affirmatively found that the petitioner and its connecting *136 carriers performed all required transportation services without negligence. The jury were instructed that "inherent vice" means "any existing defects, diseases, decay or the inherent nature of the commodity which will cause it to deteriorate with a lapse of time." They answered "No" to a special issue asking whether they found from a preponderance of the evidence that the condition of the melons on arrival in Chicago was due solely to an inherent vice, as so defined, "at the time the melons were received by the carrier at Rio Grande City, Texas, for transportation."[2]
On the basis of these special findings, the trial judge entered judgment for damages against the carrier. The judgment was affirmed by the Texas Court of Civil Appeals, 360 S. W. 2d 839, and by the Texas Supreme Court, upon the ground that, as a matter of federal law, "the carrier may not exonerate itself by showing that all transportation services were performed without negligence but must go further and establish that the loss or damage was caused by one of the four excepted perils recognized at common law." 368 S. W. 2d 99, 100. The court concluded, in view of the jury's findings, that, although "[a] common carrier is not responsible for spoilage or decay which is shown to be due entirely to the inherent nature of the goods, . . . petitioner has not established that the *137 damage in this case was caused solely by natural deterioration." Id., at 103. We granted certiorari, 375 U. S. 811, because of a conflict with an almost contemporaneous decision of the United States Court of Appeals for the Ninth Circuit holding that "in the case of perishable goods the burden upon the carrier is not to prove that the damage resulted from the inherent vice of the goods, but to prove its own compliance with the rules of the tariff and the shipper's instructions."[3] For the reasons which follow, we affirm the judgment before us.
The parties agree that the liability of a carrier for damage to an interstate shipment is a matter of federal law controlled by federal statutes and decisions. The Carmack Amendment of 1906,[4] § 20 (11) of the Interstate Commerce Act, makes carriers liable "for the full actual loss, damage, or injury . . . caused by" them to property they transport, and declares unlawful and void any contract, regulation, tariff, or other attempted means of limiting this liability.[5] It is settled that this statute has two undisputed effects crucial to the issue in this case: First, the statute codifies the common-law rule that a carrier, though not an absolute insurer, is liable for damage to goods transported by it unless it can show that the damage was caused by "(a) the act of God; (b) the public enemy; (c) the act of the shipper himself; (d) public authority; (e) or the inherent vice or nature of the goods." Bills of Lading, 52 I. C. C. 671, 679; Chesapeake & O. R. Co. v. Thompson Mfg. Co., 270 U. S. 416, 421-423; Adams Express Co. v. Croninger, 226 U. S. 491, 509; Hall & Long v. Railroad Companies, 13 Wall. 367, 372. *138 Second, the statute declares unlawful and void any "rule, regulation, or other limitation of any character whatsoever" purporting to limit this liability.[6] See Cincinnati & Texas Pac. R. Co. v. Rankin, 241 U. S. 319, 326; Boston & M. R. Co. v. Piper, 246 U. S. 439, 445. Accordingly, under federal law, in an action to recover from a carrier for damage to a shipment, the shipper establishes his prima facie case when he shows delivery in good condition, arrival in damaged condition, and the amount of damages. Thereupon, the burden of proof is upon the carrier to show both that it was free from negligence and that the damage to the cargo was due to one of the excepted causes relieving the carrier of liability. Galveston, H. & S. A. R. Co. v. Wallace, 223 U. S. 481, 492; Chicago & E. I. R. Co. v. Collins Co., 249 U. S. 186, 191; Chesapeake & O. R. Co. v. Thompson Mfg. Co., 270 U. S. 416, 420-423; Thompson v. James McCarrick Co., 205 F. 2d 897, 900.
The disposition of this case in the Texas courts was in accordance with these established principles. It is apparent that the jury were unable to determine the cause of the damage to the melons. "[T]he decay of a perishable cargo is not a cause; it is an effect. It may be the result of a number of causes, for some of which, such as the inherent defects of the cargo . . . the carrier is not liable."[7] But the jury refused to find that the carrier *139 had borne its burden of establishing that the damaged condition of the melons was due solely to "inherent vice," as defined in the instruction of the trial judgeincluding "the inherent nature of the commodity which will cause it to deteriorate with a lapse of time." The petitioner does not challenge the accuracy of the trial judge's instruction or the jury's finding.[8] Its position is simply that if goods are perishable, and the nature of the damage is spoilage, and the jury affirmatively find that the carrier was free from negligence and performed the transportation services as required by the shipper, then the law presumes that the cause of the spoilage was the natural tendency of perishables to deteriorate even though the damage might, in fact, have resulted from other causes, such as the acts of third parties,[9] for which no exception from carrier liability is provided. Consequently, it is argued, the question of "inherent vice" should not have been submitted to the jury, since the carrier in such a case does not bear the affirmative burden of establishing that the damage was caused by the inherent vice exception of the common law.
The petitioner appears to recognize that, except in the case of loss arising from injury to livestock in transit a well-established exception to the general common-law rule based on the peculiar propensity of animals to injure *140 themselves and each other[10]no distinction was made in the earlier federal cases between perishables and nonperishables. It is said, however, that the "large-scale development, in relatively recent years, of long distance transportation of fresh fruit and vegetables in interstate commerce has led to the evolution" of a new federal rule governing the carrier's liability for spoilage and decay of perishables, similar to the "livestock rule," which absolves the carrier from liability upon proof that the carrier has exercised reasonable care, and has complied with the shipper's instructions.[11]
We are aware of no such new rule of federal law. As recently as 1956, in Secretary of Agriculture v. United States, 350 U. S. 162, this Court gave no intimation that the general rule placing on the carrier the affirmative burden of bringing the cause of the damage within one of the specified exceptions no longer applied to cases involving perishable commodities.[12]
Nor do Rules 130 and 135 of the Perishable Protective Tariff, relied upon by petitioner, reflect any such change in the federal law, when read in the light of the history underlying their adoption in 1920 by the Interstate Commerce Commission. Rule 130, declaring that a carrier does not "undertake to overcome the inherent tendency *141 of perishable goods to deteriorate or decay,"[13] merely restates the common-law rule that a carrier shall not be held liable in the absence of negligence for damage resulting solely from an inherent vice or defect in the goods. And Rule 135, declaring that the carrier shall not be "liable for any loss or damage that may occur because of the acts of the shipper or because the directions of the shipper were incomplete, inadequate or ill-conceived,"[14] merely reiterates the common-law and bill-of-lading rule that the carrier shall not be liable, in the absence of negligence, for the "act or default of the shipper or owner." Neither of these rules refers to the presumptions or burdens of proof imposed by the common law, and it is clear that it was not the intention of the Commission in approving these rules to modify or reduce the commonlaw liability of a carrier. Indeed, the Commission stated at the time these rules were adopted in 1920 that "such *142 declarations can have no controlling effect, for the carrier's liability for loss or damage is determined by the law. Nothing can be added to or subtracted from the law by limitations or definitions stated in tariffs . . . . There is the constant risk, therefore, if such declarations are included, of misstating the law and misleading the parties to no good purpose." Perishable Freight Investigation, 56 I. C. C. 449, 482. Although the Commission concluded for this reason that this type of rule was generally objectionable, id., at 483, it recognized the desirability of giving "some warning to shippers" that a carrier was not liable for the inherent tendency of perishable goods to deteriorate or decay, or for the shipper's failure to give proper transportation instructions. Ibid. The rules themselves reflect nothing more than this objective.[15]
*143 That this was the limited purpose of Rules 130 and 135 is confirmed by the Commission's action in rejecting an additional proposal made by the carriers at the time these Rules were approved in 1920. The carriers sought to include a provision to be known as Item 20 (d), reading:
"Nothing in this tariff shall be construed as relieving carriers from such liability as may rest upon them for loss or damage when same is the result of carriers' negligence." See 56 I. C. C., at 481.
The Commission emphatically rejected the provision on the express ground that
"a carrier may be liable under the common law for loss or damage which is not the result of its negligence, and this item implies that there may be something in the tariff which seeks to limit such liability." Id., at 483. (Emphasis supplied.)
Finally, all else failing, it is argued that as a matter of public policy, the burden ought not to be placed upon the carrier to explain the cause of spoilage, because where perishables are involved, the shipper is peculiarly knowledgeable about the commodity's condition at and prior to the time of shipment, and is therefore in the best position to explain the cause of the damage. Since this argument amounts to a suggestion that we now carve out an exception to an unquestioned rule of long standing upon which both shippers and carriers rely, and which is reflected in the freight rates set by the carrier, the petitioner must sustain a heavy burden of persuasion. The general rule of carrier liability is based upon the sound premise that the carrier has peculiarly within its knowledge "[a]ll the facts and circumstances upon which [it] may rely to relieve [it] of [its] duty . . . . In consequence, the law *144 casts upon [it] the burden of the loss which [it] cannot explain or, explaining, bring within the exceptional case in which [it] is relieved from liability." Schnell v. The Vallescura, 293 U. S. 296, 304. We are not persuaded that the carrier lacks adequate means to inform itself of the condition of goods at the time it receives them from the shipper, and it cannot be doubted that while the carrier has possession, it is the only one in a position to acquire the knowledge of what actually damaged a shipment entrusted to its care.
Affirmed.
MR. JUSTICE DOUGLAS, with whom MR. JUSTICE BLACK concurs, dissenting.
The shipping contract in this case limited the liability of the carrier for damages in the nature of spoilage or decay to liability for negligence only. The shipping contract consists of the bill of lading and the applicable tariffs lawfully published and filed (Southern R. Co. v. Prescott, 240 U. S. 632, 637), from which there may be no departure. Id., at 638. The bill of lading provides that the goods are received, "subject to the classifications and tariffs in effect" and that every service to be performed thereunder "shall be subject to all the conditions not prohibited by law . . . including the conditions on back hereof . . . ." Its form and terms are part of Uniform Freight Classification No. 4, one of the tariffs lawfully filed and published pursuant to § 1 (6) of the Act. Classification No. 4 provides for various rates for various types of service and limits liability according to the rate paid, such limitations being held lawful by the Interstate Commerce Commission. Bills of Lading, 52 I. C. C. 671, 684 et seq.; Domestic Bill of Lading, 64 I. C. C. 357, 360-361.
Under Classification No. 4 the shipper has the option of shipping his goods either under the uniform bill of *145 lading, with a "limited liability," or under "a common carrier's liability." If he chooses the latter he pays a rate 10% higher. Here the shipper chose "limited liability." One type of limitation is a tariff that limits the amount of damages for the loss of a shipment. See, e. g., Pierce Co. v. Wells, Fargo Co., 236 U. S. 278. There the amount of recovery for negligence is allowed to be limited where the filed tariffs so provide, the shipper having the privilege of paying an increased rate and obtaining liability for the full value. Id., at 283. Here there is no question of a carrier's being exempt from any liability caused by negligence. Rather it turns on Rule 130 and Rule 135 of the Perishable Protective Tariff No. 17, the tariff brought into play by the bill of lading.
Rule 130 states: "Carriers furnishing protective service as provided herein do not undertake to overcome the inherent tendency of perishable goods to deteriorate or decay, but merely to retard such deterioration or decay insofar as may be accomplished by reasonable protective service, of the kind and extent requested by the shipper, performed without negligence." (Italics added.)
Rule 135 states: "Property accepted for shipment under the terms and conditions of this tariff will be received and transported subject to such directions, only, and to such election by the shipper respecting the character and incidents of the protective service as are provided for herein. The duty of the carrier is to furnish without negligence reasonable protective service of the kind and extent so directed or elected by the shipper and carriers are not liable for any loss or damage that may occur because of the acts of the shipper or because the directions of the shipper were incomplete, inadequate or ill-conceived." (Italics added.)
These provisions were approved by the Commission (see Perishable Freight Investigation, 56 I. C. C. 449, 483), *146 the declarations being "predicated upon the special hazard resulting from the perishable nature of the freight, or from the exercise by the shipper of some measure of control over the form or degree of protective service accorded." Id., at 481.
Rules 130 and 135 are not in derogation of common-law liability which, as we said in Secretary of Agriculture v. United States, 350 U. S. 162, 165, note 9, was codified in § 20 (11) of the Act. That liability exempts the carrier only for damage caused by the shipper, acts of God, the public enemy, public authority, or "the inherent vice or nature of the commodity." Rules 130 and 135 merely operate within the ambit of the last category, supplying appropriate standards for its application.
Such a tariff has the force and effect of a federal statute. See Southwestern Sugar & Molasses Co. v. River Terminals Corp., 360 U. S. 411. "Until changed, tariffs bind both carriers and shippers with the force of law." Lowden v. Simonds-Shields-Lonsdale Grain Co., 306 U. S. 516, 520; Crancer v. Lowden, 315 U. S. 631, 635.
It is under Uniform Freight Classification No. 4, the bill of lading, and the Rules of the Perishable Protective Tariff that we must decide this case.
The jury found that petitioner "performed without negligence the transportation services as provided by the terms and conditions of the bill of lading and as instructed by the plaintiff and in a reasonably prudent manner as to matters not covered by the bill of lading or the plaintiff's instructions." The jury, however, refused to find that the damage was caused by "the inherent nature of the commodity which will cause it to deteriorate with a lapse of time." Judgment was entered for the shipper and this Court now affirms the judgment of the Texas Supreme Court.
*147 I would reverse. In my opinion the Court should hold that a carrier of perishables overcomes the shipper's prima facie case when he demonstrates, as here,[1] that the nature of the damage is spoilage and decay and that he performed the protective services ordered and paid for by the shipper and all other duties in a reasonably prudent manner. Any other rule nullifies the provisions of the tariff which permit the shipper to select from numerous protective services and pay the corresponding charge, and which provide that "[t]he duty of the carrier is to furnish without negligence reasonable protective service of the kind and extent so directed or elected by the shipper . . . ."
The protective service ordered by respondent when the melons were delivered to petitioner for shipment was "standard refrigeration to destination." An expert witness explained that " `standard refrigeration to destination'. . . means that the car will be reiced to capacity at all regular icing stations."[2] Generally, the services available *148 for fresh fruits, vegetables, berries or melons include refrigeration with salt; standard refrigeration; initial icing only; initial icing with limited number of re-icings; half-stage refrigeration; top or body icing; cooling in car; fumigation; ventilation; and protection against cold (heater service). The "[c]harges published herein for protective service," says the tariff, "will be in addition to and independent of all freight rates . . . ." A shipper, in other words, by paying one charge gets one service and by paying a lesser charge gets a lesser service.
In the instant case, the melons were inspected at destination by the United States Department of Agriculture. The report said:
"Condition: Generally hard to firm; white to cream color. In most samples 1 to 4 melons per crate, some none, average approximately 15% damaged by light to dark brown discoloration, some of which is sunken, occurring over 1/8 to 1/2 of surface. In most samples none, some 1 or 2 melons per crate, average approximately 3% decay, Bacterial Soft Rot, generally in advanced stages.
"Grade: Now fails to grade U. S. No. 1 only account discoloration and decay."
*149 The defects in the melons were described by an inspector for the Railroad Perishable Inspection Agency, an organization formed by an association of carriers:[3]
"Well, light brown discoloration is actually a surface blemish of the melon. It's quite common to find that condition at destination markets, and we believe it's associated with immaturity. That is, if a melon is harvested a little bit immature during the grading and packing operation, it will get very slight abrasions, and then the surface will darken.
.....
"Bacterial Soft Rot is a decay ofit's common decay found in many fruits and vegetables. It's caused by an organism, bacterial organism, and it's of field origin. The bacteria are commonly found on plant debris and that sort of thing, and it develops when the conditions of temperature and moisture are ripe for the development, bacteria-wise. You find it very commonly at destination on a great many fruits and vegetables.
.....
"Well, the temperatures we have here would be favorable to retard that decay, because the lower the temperature you have, the more you are going to retard the development of Soft Rot.
.....

*150 "It's my opinion that the decay originated at shipping point, either during the harvesting or the packing operation, and that the decay developed so that it was noticeable at destination."
The inherent weakness of perishable products and the owner's superior familiarity with them are reflected in Rules 130 and 135 of the Perishable Protective Tariff, which, as I have said, relate the charge to the protective service desired by the shipper. The necessary protective service varies greatly for conditions such as those enumerated in Perishable Freight Investigation, supra, at 468:
Character of the commodity; variety of the same commodity; local climate; season when shipped; weather variations from year to year and from day to day; length of haul; condition of the commodity; use to which it is to be put; package in which it is shipped; schedule of freight-train operation; pre-cooling of shipments; method of loading; weight loaded; character of car furnished.
And see Providence Fruit & Produce Exchange v. New York Central & Hudson R. Co., 33 I. C. C. 294, 295, 296.
Respondent could have selected any one of a wide variety of protective services, paying a higher or lower charge as the case may be. It was testified that respondent, for example, could have ordered a specified percentage of salt to be added to the icings so as to speed up the refrigeration process. Instead, for whatever reason, respondent ordered the cheaper service.
Notwithstanding this, the Court ignores the obvious difference between perishables and nonperishables and formulates a rule contrary to a valid tariff and the weight of authority.[4]
*151 As the Court of Appeals for the Ninth Circuit said, speaking through Judge Merrill: ". . . in the case of perishable goods the burden upon the carrier is not to prove that the damage resulted from the inherent vice of the goods, but to prove its own compliance with the rules of the tariff and the shipper's instructions." Larry's Sandwiches, Inc., v. Pacific Electric R. Co., 318 F. 2d 690, 692-693.
In my opinion, the Court should recognize Uniform Freight Classification No. 4 and the Rules of the Perishable Protective Tariff as having the force of a statute, limiting liability to the service asked, paid for, and rendered. What we do today allows a shipper, under the guise of buying transportation service, to sell a car of produce to the railroad.
NOTES
[1] The complaint contained four independent counts, each stating a separate claim for damage to a different shipment of perishables. The shipment involved here is solely that covered by Count 1, which related to the shipment of 640 crates of honeydew melons in Car ART 35042 from Rio Grande City to Chicago.
[2] The jury also refused to find that the damage was caused by acts or omissions of the shipper in the shipping instructions:

"Do you find from a preponderance of the evidence that the worsened condition . . . was caused solely by carrying out the instructions for handling this shipment given by the shipper to the carrier, although these instructions, together with the obligations of the defendant under the bill of lading and in the performance of all other matters not covered by the bill of lading and the instructions were carried out in a reasonably prudent manner, if you have so found?
"Answer `yes' or `no.'
"We, the jury, answer: No."
[3] Larry's Sandwiches, Inc., v. Pacific Electric R. Co., 318 F. 2d 690, 692-693. Cf. Trautmann Bros. Co. v. Missouri Pac. R. Co., 312 F. 2d 102; United States v. Reading Co., 289 F. 2d 7; Atlantic Coast Line R. Co. v. Georgia Packing Co., 164 F. 2d 1.
[4] 34 Stat. 595.
[5] See 24 Stat. 386, as amended; 49 U. S. C. § 20 (11).
[6] The meaning of § 20 (11) was reaffirmed by the Cummins Amendment of 1915. 38 Stat. 1196. Clearly recognizing that the phrase "caused by" did not limit the carrier's liability to cases of negligence, but covered liability without fault except where the specific commonlaw exceptions could be established, the Cummins Amendment permitted the carrier to require the shipper to file a timely notice of his claim prior to filing a lawsuit in cases where the carrier was without fault but forbade such a condition where the loss resulted from the carrier's negligence. See Chesapeake & O. R. Co. v. Thompson Mfg. Co., 270 U. S. 416, 422. The proviso forbidding the notice requirement in cases of negligence was repealed in 1930 (46 Stat. 251).
[7] Schnell v. The Vallescura, 293 U. S. 296, 305-306.
[8] The petitioner does appear to argue, however, that the rule applied by the Texas courts required it to show some specific peculiar defect in this particular shipment of perishables. We find no intimation of such a requirement either in the trial court's instructions or in the Texas Supreme Court's opinion. The Texas courts merely placed upon the petitioner the affirmative burden of satisfying the jury that the cause of the spoilage was the natural tendency of perishables to deteriorate over time.
[9] "[T]he carrier is responsible without regard to the exercise of due care, even though the damage or loss be occasioned by the independent act of third persons." Commodity Credit Corp. v. Norton, 167 F. 2d 161, 164-165.
[10] See, e. g., North Pennsylvania R. Co. v. Commercial Bank, 123 U. S. 727, 734.
[11] With respect to wholly intrastate shipments, this is the rule in a number of States. See, e. g., Southern Pacific Co. v. Itule, 51 Ariz. 25, 74 P. 2d 38.
[12] The Court noted that it was "conceded" that § 20 (11) of the Interstate Commerce Act codified "the common-law rule making a carrier liable, without proof of negligence, for all damage to the goods transported by it, unless it affirmatively shows that the damage was occasioned by the shipper, acts of God, the public enemy, public authority, or the inherent vice or nature of the commodity." 350 U. S., at 165-166 n. 9.
[13] "RULE 130CONDITION OF PERISHABLE GOODS NOT GUARANTEED BY CARRIERS.

"Carriers furnishing protective service as provided herein do not undertake to overcome the inherent tendency of perishable goods to deteriorate or decay, but merely to retard such deterioration or decay insofar as may be accomplished by reasonable protective service, of the kind and extent requested by the shipper, performed without negligence." General Rules and Regulations of the Interstate Commerce Commission, Perishable Protective Tariff No. 17, I. C. C. No. 34, W. T. Jamison, Agent.
[14] "RULE 135LIABILITY OF CARRIERS.

"Property accepted for shipment under the terms and conditions of this tariff will be received and transported subject to such directions, only, and to such election by the shipper respecting the character and incidents of the protective service as are provided for herein. The duty of the carrier is to furnish without negligence reasonable protective service of the kind and extent so directed or elected by the shipper and carriers are not liable for any loss or damage that may occur because of the acts of the shipper or because the directions of the shipper were incomplete, inadequate or ill-conceived." Ibid.
[15] The suggestion is made that because the shipper elected to ship under the terms and conditions of the Uniform Domestic Straight Bill of Lading, the carrier's liability is limited to negligence. But insofar as damage to merchandise in transit is concerned, the bill provides for full "common-law liability." Section 1 (a) of the bill provides that "[t]he carrier or party in possession of any of the property herein described shall be liable as at common law for any loss thereof or damage thereto, except as hereinafter provided." Section 1 (b) provides, in pertinent part, that a carrier shall not be liable for damage "resulting from a defect or vice in the property." Nothing in the language of this contract even remotely suggests that the carrier does not bear the affirmative burden of proving that the damage was caused by a defect or vice in the property. Indeed, we think it significant that the identical bill of lading is used for the shipment of both perishable and nonperishable commodities, while a quite different contract, the Uniform Live Stock Contract, is employed in the shipment of livestock. See Uniform Freight Classification No. 4, p. 204.

Limitations on liability contained in other sections of the bill of lading apply to circumstances not covered by the Carmack Amendment. It could not lawfully be otherwise, for the Amendment codified the common-law liability for damage to goods in transit, and its legal effect was "to bar the Interstate Commerce Commission from legalizing tariffs limiting the common-law liability of a carrier for such damage. The common law, in imposing liability, dispensed with proof by a shipper of a carrier's negligence in causing the damage." Secretary of Agriculture v. United States, 350 U. S. 162, 173 (Frankfurter, J., concurring).
[1] Respondent has not seriously contended that such things as "Bacterial Soft Rot, generally in advanced stages" and "discoloration" are other than conditions of deterioration, spoilage and decay. The principal dispute at the trial centered around whether or not the shipper had in fact performed the requested services in a reasonably prudent manner, with respondent, more specifically, attempting to indicate that perhaps the refrigeration equipment was not functioning properly.
[2] The same expert witness discussed the various kinds of protective service available:

"Q. . . . [W]ho dictates or orders or determines what type of service shall be furnished on a refrigerator car on a particular shipment?
"A. The shipper.
"Q. And are there various kinds of services that he can select that he can direct the railroad to furnish?
"A. Yes. The Perishable Tariff hasI wouldn't know just how many, but perhaps a hundred different classes of service, starting with ventilation, which is no ice at all. He may ship with one icing only, initial icing, Rule 240. He may start with two icings, three and four. With standard icingwhich is icing at all regular icing stationshe, in addition to that, can specify salt, if he wants to, certain percentage of salt, which is supposed to step up the meltage and refrigeration. There are a hundred classes of service from which the shipper dictates what he thinks, in his opinion, will best protect his shipment."
Details on the numerous protective services available are contained in Perishable Protective Tariff 18, Local, Joint and Proportional Charges and Rules and Regulations Governing the Handling of Perishable Freight, National Perishable Freight Committee, I. C. C. 37 (1960).
[3] The only contradictory testimony came from respondent's office manager who, after stating on cross-examination that he would not attempt any opinions about "decay and sunken areas and discoloration or things like that," said on redirect examination:

"Q. Have you developed in your experience in this business over seventeen years a general knowledge of what causes the decay in some instances?
"A. Yes. Improper refrigeration, I would say."
[4] See Mirski v. Chesapeake & Ohio R. Co., 44 Ill. App. 2d 48, 194 N. E. 2d 361; Trautmann Bros. Co. v. Missouri Pac. R. Co., 312 F. 2d 102 (C. A. 5th Cir.); and Larry's Sandwiches, Inc., v. Pacific Elec. R. Co., 318 F. 2d 690 (C. A. 9th Cir.).