No. 80-443

IN THE SUPREME COURT OF THE STATE OF MONTANA

1981

_____

ADD REESE,

Plaintiff and Respondent,

vs.

MIDLAND EMPIRE PACKING CO.,
INC., a Corporation,

Defendant and Appellant.

_____

Appeal from: District Court of the Thirteenth Judicial District,
In and for the County of Yellowstone.
Honorable Robert Wilson, Judge presiding.

Counsel of Record:

For Appellant:

Berger, Anderson, Sinclair, Murphy, Nelson, Edwards,
and Molloy, Billings, Montana

For Respondent:

Ralph Herriott, Billings, Montana

_____

Submitted on briefs: April 2, 1981

Decided: May 20, 1981

Filed: MAY 20 1981

*Thomas J. Kearney*
_____
Clerk

Mr. Justice Frank B. Morrison, Jr., delivered the Opinion of the Court.

Midland Foods, Inc., (shipper) appeals from a judgment of $14,960.11 in favor of Add Reese (carrier) entered September 11, 1980, in the Thirteenth Judicial District, Yellowstone County, Honorable Robert H. Wilson presiding, following a trial of the court held on August 12, 1980. We affirm the trial court's judgment in favor of the carrier.

This dispute involves liability for damage to 152 boxes of boned bull meat weighing 9,120 pounds. The meat was part of a shipment taken by the carrier from the shipper's dock in Billings, Montana, and delivered to Lucky Stores, Buena Park, California, in March of 1974. The disputed 152 boxes of bull meat were refused by Lucky Stores when delivered by the carrier. The shipper deducted the value of the rejected meat from an open account maintained with the carrier. The carrier then brought this action.

The issues on appeal are:

1. Whether under the Carmack Amendment, 49 U.S.C., §20 (11), (49 U.S.C., §11707), the shipper is entitled to judgment as a matter of law.

2. Whether there are sufficient facts in the record to support the findings made by the trial court.

The trial court found that on March 12, 1974, the shipper's employees loaded 30,000 pounds of fresh meat into the carrier's refrigerated truck-trailer unit for transport to Lucky Stores in Los Angeles, California. The loaded meat came from cattle killed by the shipper in its processing plant at Billings, Montana, and from carcasses delivered to the shipper by Caviness Packing Company of Texas. The court further found that the shipper's employees exercised exclusive control of the meat during both the butchering and

-2-

loading process. Carrier's drivers picked up the refrigerated trailer unit after loading.

The refrigerated trailer unit was designed to hold the temperature of the meat cargo at the same temperature the meat was when loaded. The temperature of the trailer unit was set at 20° F. The cooling unit would not lower the temperature of the cargo below that at which it was loaded. The court found that the refrigerated unit functioned properly on the haul to Los Angeles.

At the time of delivery to Lucky Stores on March 14, 1974, the load was inspected by one Whisler, an employee inspector of Lucky Stores. Whisler endorsed upon the freight bills and bills of lading, the temperature of the meat, 34° F --50° F, without specifying the particular temperature of any box in the load. Contrary to ordinary business practice, Whisler did not endorse upon the freight bills or bills of lading the reason for rejection of the cargo. The carrier's driver testified that Whisler rejected the meat because "he thought the meat had been loaded frozen and it was in a thawing process when I delivered it." The frosted meat was in boxes on the floor of the trailer unit. After learning of the rejection, the shipper directed that the meat be taken to Pacific Cold Storage, where it was frozen.

The shipper's meat broker later checked the load in storage and advised the shipper that the load was rejected because it was "off odor". The shipper contends throughout the case that "off odor" was the basis for rejection. The trial court did not make a finding respecting the reason for Lucky Stores rejecting the load.

Pursuant to direction from the shipper, the carrier returned the meat to the shipper in a trailer unit carrying

vegetables. The temperature of the trailer unit, while hauling vegetables, was held at 38° F, which would not prevent the frozen meat from thawing. This fact was known to the shipper. When the meat arrived in Billings, it was "soggy", and blood was running out of the boxes. The meat was eventually submitted to a rendering process by the shipper and sold for animal consumption.

The trial court found that the carrier's refrigerated trailer unit functioned properly at all times. This finding was premised upon the fact that the equipment was new and upon the driver's testimony that periodic checks of the load were made during transport.

Liability for damage to interstate shipments is governed by the Carmack Amendment, 49 U.S.C., §20(1), reenacted as 49 U.S.C., §11707, without substantive change. This statute codifies the common-law rule that a carrier, though not an absolute insurer, is liable for damage unless the damage is caused by: (1) an act of God, (2) the public enemy, (3) the act of the shipper, (4) a public authority, or, (5) the inherent vice or nature of the goods. Missouri Pacific Railroad v. Elmore & Stahl (1964), 377 U.S. 134, 138, 84 S.Ct. 1142, 1145, 12 L.Ed.2d 194.

For the shipper to establish a prima facie case, it must show that the meat was delivered to the carrier in good condition and arrived in a damaged condition. The burden is then on the carrier to show: (1) freedom from negligence and (2) applicability of at least one of the enumerated exceptions. Missouri Pacific Railroad.

The carrier's case rests upon a description of its equipment and testimony by the driver that the unit functioned properly throughout the trip. The shipper's case is that the meat was delivered in good condition and, therefore,

must have deteriorated during the haul. We have carefully reviewed the record to determine if there is substantial credible evidence to support the judgment entered by the trial court.

The record is not clear on whether the meat was rejected by Lucky Stores because it was thawing or because the meat was "off odor". There is evidence to support each.

The strongest evidence supporting the position of the shipper that the condition of the meat changed during the period of transportation, comes from two sources. First, all of the meat that was rejected was on the bottom of the trailer unit. The record is devoid of evidence from the shipper's employees regarding how the boxes of meat were stacked prior to being loaded in the trailer unit. Nevertheless, assuming the trailer was loaded from front to back, the shipper can argue that all of the meat found to be in a "thawing process" would not have been on the bottom of the trailer unit unless the condition of the meat changed after it was loaded.

The shipper's position also finds some support in the fact that, if the temperature of the trailer was held at 20° F throughout the trip, the meat would not have been in a "thawing process", at the time it was delivered to Lucky Stores. Again, the record is devoid of evidence regarding whether frozen meat would thaw at a temperature of 20° F.

However, if there is substantial credible evidence to support the trial court's decision in favor of the carrier, we must affirm. We find such evidence to exist.

The temperature of the meat at the time of delivery to Lucky Stores ranged from 34° F to 50° F. The record discloses the reason for this variation. The shipper finished boning part of the bull meat on Monday, March 11, and the remainder on Tuesday, March 12. The meat was shipped on

March 12. The meat which was boned on Monday was put into a freezer at -10° F until it was loaded Tuesday. The meat that was boned on Tuesday was being processed in a room where the temperature varied from 32° F to 50° F. It was not subjected to freezing temperatures and was loaded after it was boned on Tuesday. These facts account for the wide variation in meat temperature found at the Lucky Stores.

Whether the meat was rejected because it was warm and "off odor" or because it was "thawing" the record can inferentially support the meat being loaded by the shipper in the same condition it was found to be in when examined at Lucky Stores. We must affirm the trial court if there is any substantial credible evidence to support its judgment. Rule 52, M.R.Civ.P.

Under the Carmack Amendment, the carrier had the burden of proving that the shipper was responsible for the loss. The carrier met that burden by proving that the equipment did not malfunction during the trip, thereby creating an inference of damage occurring prior to the haul. Although the shipper's testimony attempted to prove that the meat was in an acceptable condition when it was loaded, there is evidence in the record from which the trial court could find that the meat rejected by Lucky Stores was in that same condition when loaded by the shipper. Therefore, the shipper's conduct in handling the meat led to the rejection. Although we might have decided the case differently had we been the trier of fact, there is sufficient evidence in the record to support the findings made by the trial court.

The judgment is affirmed.

_____
                    Justice

-6-

We concur:

_Gene B. Daly_

_John C. Sheehy_

_Daniel J. Shea_

_Frank I. Haswell_
Justices