The LONG ISLAND RAIL ROAD COMPANY, Plaintiff,

v.

UNITED STATES DEPARTMENT OF AGRICULTURE, Defendant.

No. 81 CV 0059 (ERN).

United States District Court,
E.D. New York.

July 12, 1983.

Thomas M. Taranto by Linda A. Mule, Jamaica, N.Y., for plaintiff.

Raymond J. Dearie, U.S. Atty., E.D.N.Y. by Wentworth E. Miller, Asst. U.S. Atty., Brooklyn, N.Y., for defendant.

## MEMORANDUM AND ORDER

NEAHER, District Judge.

The Long Island Rail Road Company ("LIRR") commenced this action to recover underpayments of transportation fees incurred by the Commodity Credit Corporation ("CCC"), an agency of the United States Department of Agriculture. By answer and counterclaim, CCC asserted that its reduced payment resulted from a set-off of losses it suffered on other shipments performed by the LIRR. CCC has now moved for summary judgment, asserting that the LIRR improperly denied CCC's claims for lost and damaged goods on the earlier shipments, and that set-off was an appropriate action. The LIRR has cross-moved for summary judgment, claiming that the documentation provided by CCC of its losses on the earlier shipments was inadequate to justify payment. For the reasons that follow, the court concludes that CCC's claim to the LIRR clearly has established its losses, and that CCC is entitled to partial summary judgment in its favor. The LIRR has, however, raised factual questions concerning one damage claim which can only be resolved by trial.

The first disputed shipment commenced on or about December 13, 1977. The "Report of Shipment Received Over, Short and/or Damaged" Form (hereinafter referred to as "Shortage and/or Damage Form"), signed and submitted by the consignee, claimed that 1,200 cases of peanut butter were reported as shipped, but only 1,184 were received. The form further noted that the shortage was discovered "during unloading" by "physical recount". The LIRR subsequently requested additional documentation, including the consignee's certification that the missing cases had not been received from another source and the consignee's unloading tallies for any stop-off and final destinations. CCC supplied the certification, and further certified through the consignee that unloading tallies were unavailable. CCC claimed $315.20 damages for the missing sixteen cases of peanut butter. The LIRR denied the claim, citing the absence of unloading tallies.

On or about February 28, 1978, CCC shipped 1,720 cartons of processed cheese to two separate destinations. According to the Shortage and/or Damage Form submitted by the consignee at one destination, of the 1,120 cartons reported shipped, 1,113 were received. The consignee's signed form added that the shortage was discovered "after unloading" by "physical recount". By similar form, the consignee at the second location indicated receipt of 597 cartons of

600 reported sent. Again in response to the LIRR's inquiry, CCC supplied both consignees' certifications that the goods were not received from other sources and that stop-off and final unloading tallies were unavailable. CCC's claim, amounting to $308.10, was denied, and the lack of unloading tallies was cited.

The final shipment in issue commenced on or about October 31, 1978. The consignee's signed Shortage and/or Damage Form declared that 2,865 cartons of processed cheese were reported shipped. Of these, the consignee reported a shortage of 42 cartons, and damage to an additional 57 cartons. The form indicated that the shortage was discovered "after unloading" by "unloading tally" and "physical recount", and that the damage was discovered "during unloading". After the LIRR's subsequent inquiry, however, only the unloading tally for the stop-off was supplied, and it showed no shortage. Again, the consignee did submit a certification that the missing goods had not been received from another source, and that no additional unloading tallies existed. Again, the LIRR denied the claim for want of unloading tallies. The Shortage and/or Damage Form further noted that the damage consisted of "water damage and disintegration of cartons" discovered "during unloading" and that the mechanical refrigeration equipment was in operation. This claim was also denied by the LIRR.

CCC asserted that its shortage and damage claims were supported by "notices of loss; claims identifying the shipments, their contents and value, the dates of arrival and amount of shortage and/or damage, and demanding payment; bills of lading; inbound and outbound seal numbers, where available; verifications of loss; and certified statements and reports from the consignee that the shortages had not been received from any other source," as well as by each consignee's certification that the requested unloading tallies had never been made. By affidavit, Anthony A. Pontorno, the Assistant Manager of Freight Claims and Damage Prevention for the LIRR, defined an unloading or stroke tally as "an informal document created by the consignee who unloads the freight [providing] a notation of each and every piece that comes off the car." He stated that the consignees generally create these tallies to protect against overcharges. Offered as his opinion, he added that "an unloading tally is the only reliable document with which to prove a claim of shortage."

Both parties have moved for summary judgment on the claims for the lost goods, and both assert that no genuine issue of material facts remain. The only issue on these claims is thus a legal one—whether the documentation submitted by CCC to the LIRR is sufficient to support a finding that CCC is entitled to recover its claimed losses. Disposition of this issue by summary judgment is accordingly appropriate. *See S.E.C. v. Research Automation Corp.*, 585 F.2d 31, 33–34 (2d Cir.1978).

■ Carriers are liable for losses or damages during shipment unless the carrier can demonstrate that it was not negligent and that one of five recognized carrier defenses applies. 49 U.S.C. §§ 20(11), 11707. To recover, however, the shipper must initially prove delivery of the goods to the carrier, receipt by ·the consignee of the goods in diminished quantity or quality after transportation, and damages. *Missouri Pacific Railroad Co. v. Elmore & Stahl*, 377 U.S. 134, 138, 84 S.Ct. 1142, 1145, 12 L.Ed.2d 194 (1964).

Detailed regulations have been promulgated concerning the voluntary disposition of carrier loss and damage claims. *See* 49 C.F.R. Part 1005. These regulations have been further supplemented by a release from the Interstate Commerce Commission entitled "22 Questions and Answers". Defendant's Memo in Support of Motion for Summary Judgment at Appendix. Section 1005.2 establishes prerequisites for filing a claim, and § 1005.4 requires prompt investigation of a claim through supporting documents. Section 1005.2(b) sets forth the minimum filing requirements:

> A ... communication ... from a claimant, filed with a proper carrier within the

time limits specified in the bill of lading or contract of carriage or transportation and: (1) Containing facts sufficient to identify the baggage or shipment (or shipments) of property, (2) asserting liability for alleged loss, damage, injury, or delay, and (3) making claim for the payment of a specified or determinable amount of money, shall be considered as sufficient compliance with the provisions for filing claims embraced in the bill of lading or other contract of carriage.

Section 1005.4(c) specifically adds:

When an asserted claim for loss of an entire package or an entire shipment cannot be otherwise authenticated upon investigation, the carrier shall obtain from the consignee of the shipment involved a certified statement in writing that the property for which the claim is filed has not been received from any other source.

The parties cite three of the "22 Questions and Answers" as relevant to the present claims:

8. Question. Do the provisions of section 1005.4(c), pertaining to the verification of certain losses, mean that a shipper absolutely cannot have a cargo claim paid by a carrier absent a certified statement from the consignee of the shipment that the property involved has not been received from any other source?

Answer. No. The underlying purpose of all of the regulations is to motivate fact-finding efforts and to encourage, as much as regulations can, responsible claim-prevention as well as claim-processing practices. Section 1005.4(c) should induce the fullest practicable investigation of all shortage claims. This Commission is aware, however, that a shipper-claimant and a carrier may encounter difficulty in concluding certain claims because a consignee whom they cannot control may prove to be uncooperative and decline to execute the document. When such circumstances are clearly established in the processing of a claim, the regulation should not be construed to require the performance of an impossible act. . . .

9. Question. Is a carrier now required to pay all cargo claims filed with it?

Answer. No. . . . Carrier liability is to be determined by the facts and applicable law in each case and the provisions of section 1005.5 should not be construed as requiring payment in all instances. . . . .

11. Question. May a carrier disallow a claim until the supporting documents required under the regulations are contained in the claim file?

Answer. The answer to this question really depends upon the meaning of the word "disallow." A carrier may not pay a claim until such time as it is fully and properly supported. The regulation should not be construed, however, to mean that a given claim should be declined or returned when it is filed simply because certain of the required supporting documents have not been supplied or are not in the file.

Finally, the LIRR points to 49 U.S.C. § 11903, which imposes criminal liability for granting or accepting discounts or rebates for regulated interstate transportation services. Payment of an unsupported claim, the LIRR argues, would run afoul of this prohibition.

The statute and regulations are designed to facilitate voluntary settlements. Under this scheme, once shippers document a basis for their losses, carriers should promptly investigate and resolve their claims.

■ Without dispute, CCC provided the LIRR with sufficient documentation of its delivery to the LIRR of certain quantities of goods for each shipment. CCC also promptly notified the LIRR of its claimed losses. The consignees for each of the disputed shipments supplied to the LIRR specific descriptions of the losses and certifications that they had not otherwise obtained the goods. The LIRR then requested copies of the consignees' unloading tallies, and all of the consignees certified that these documents could not be provided. Nothing in the record reflects that the LIRR took further steps to investigate these claims. In-

**1452**

stead, the LIRR simply repeated its determination that the claims would not be paid in the absence of unloading tallies.

The statute and regulations certainly do not mandate the payment of spurious claims. Examining the claims as presented by CCC to the LIRR, however, the court concludes that CCC provided the LIRR with sufficient indicia of its losses. The LIRR cannot insulate itself from any payment unless a shipper complies with the LIRR's self-defined standard for a provable claim. Provision of the unloading tallies is, in this case, an impossible act. The LIRR's insistence that it will not pay CCC's claims unless the consignees come forward with the nonexistent tallies is an unsupportable subversion of the spirit of the statute and regulations.

The facts in this case simply provide no support for the LIRR's protestations that it must insist on certain forms of documentation to avoid accusations that it is paying sham claims as an illegal rebate to CCC. Faced with CCC's certifications of its losses, the LIRR has offered nothing to disprove that the losses occurred during shipment. Additionally, the LIRR has never contended that any recognized carrier defense applies to this action. By regulation, CCC was entitled to set off any payment arising from lost or damaged shipment and declined by a rail carrier without reasonable justification. 7 C.F.R. § 1408.4(e). Accordingly, partial summary judgment is granted in CCC's favor on its affirmative defense to nonpayment of portions of LIRR shipment fees.

■ On CCC's claim for damage to the third shipment, however, the LIRR has made factual allegations tending to rebut CCC's claims. By affidavit, Anthony A. Pontorno stated that he personally inspected the damaged cheese and rejected CCC's claims for reasons stated in a May 24, 1979 letter addressed to the U.S. Department of Agriculture. The letter, annexed to his affidavit, reported that the cheese appeared to have molded from age, that the code numbers and packaging dates supplied by CCC did not correspond with the LIRR's records, and that the carton destruction seemed to have resulted from rodent infestation. The letter also claimed that no evidence existed of a rodent problem onboard the LIRR vehicle, and asserted that the infestation must have occurred before or after the shipment. This affidavit and exhibit establish a material factual dispute which cannot be resolved on summary judgment. Trial on this issue is therefore set for October 11, 1983. Requests for postponement will not be considered.

SO ORDERED.