**UNPUBLISHED**

**UNITED STATES COURT OF APPEALS**

**FOR THE FOURTH CIRCUIT**

AIG EUROPE, S.A.,
<u>Plaintiff-Appellee,</u>

v.

LOCUST POINT TERMINAL
CORPORATION, t/a Marine Freight
Company,
<u>Defendant-Appellant,</u>

and

No. 96-2437

M/V MSC LAUREN, its tackle, boats,
engines, etc., in rem; M/V MSC
CHIARA, its tackle, boats, engines,
etc., in rem; MEDITERRANEAN
SHIPPING COMPANY, S.A.; M/V
SEXTUM, its tackle, boats, engines,
etc., in rem,
<u>Defendants.</u>

AIG EUROPE, S.A.,
Plaintiff-Appellant,

v.

MEDITERRANEAN SHIPPING COMPANY,
S.A.; LOCUST POINT TERMINAL
CORPORATION, t/a Marine Freight
Company,
Defendants-Appellees,                                    No. 96-2481

and

M/V MSC LAUREN, its tackle, boats,
engines, etc., in rem; M/V MSC
CHIARA, its tackle, boats, engines,
etc., in rem; M/V SEXTUM, its
tackle, boats, engines, etc., in rem,
Defendants.

Appeals from the United States District Court
for the Eastern District of Virginia, at Norfolk.
Henry C. Morgan, Jr., District Judge.
(CA-95-1024-2, CA-95-1025-2)

Argued: June 5, 1997

Decided: January 5, 1998

Before RUSSELL, HAMILTON, and MOTZ, Circuit Judges.

_____

Affirmed by unpublished per curiam opinion.

_____

**COUNSEL**

**ARGUED:** Timothy Sean Brunick, KNIGHT, DUDLEY, CLARKE
& DOLPH, P.L.C., Norfolk, Virginia; Vincent M. De Orchis,

2

DE ORCHIS & PARTNERS, New York, New York, for Appellant. Carter Branham Snow Furr, MCGUIRE, WOODS, BATTLE & BOOTHE, L.L.P., Norfolk, Virginia, for Appellee. **ON BRIEF:** Mark S. Davis, MCGUIRE, WOODS, BATTLE & BOOTHE, L.L.P., Norfolk, Virginia, for Appellee AIG. Edward J. Powers, VANDE-VENTER, BLACK, MEREDITH & MARTIN, Norfolk, Virginia, for Appellee Mediterranean Shipping.

_____

Unpublished opinions are not binding precedent in this circuit. See Local Rule 36(c).

_____

## OPINION

PER CURIAM:

Locust Point Terminal Corporation, t/a Marine Freight Company ("Marine Freight"), appeals from the district court's order granting judgment to AIG Europe, S.A. ("AIG") against Marine Freight, granting judgment to Mediterranean Shipping Company ("MSC") against AIG, and declining to award pre-judgment interest to AIG. AIG noted a cross-appeal. Finding no reversible error, we affirm.

AIG is an underwriter who insured two shipments of tanned and dyed leather skins from Italian Leather S.P.A. ("I.L. Italy") in Bari, Italy, to its subsidiary, Italian Leather USA, Inc. ("I.L. USA"), in Randleman, North Carolina. When the shipments arrived at I.L. USA, it was discovered that part of the cargo was missing. AIG brought suit in the district court against MSC and Marine Freight to recover damages it suffered as a result of the missing cargo.

The first shipment of skins from I.L. Italy to I.L. USA consisted of ten wooden pallets loaded into a twenty-foot shipping container[1] at

_____

[1] Both shipments were carried inside sealed multi-modal containers. Multi-modal containers are metal, rectangular boxes that can be stacked aboard ships, loaded onto trains, or mounted upon truck trailer frames without having to disturb the container with each transfer.

3

I.L. Italy's warehouse on September 23, 1994. Each pallet was stacked with twelve, six-foot-long cartons, each containing approximately twenty tanned and dyed leather skins. I.L. Italy locked and sealed the shipping container with a steel band-type seal. Zeta Systems, an Italian corporation that arranges shipments of cargo for Italian shippers, transported the containers by truck to the port of Naples.[2] At the port, Zeta Systems delivered the containers to MSC for transportation by ship to Norfolk, Virginia. Before loading the cargo aboard an MSC ship, MSC placed its own bolt-type security seal on the containers' doors. MSC then loaded the container onto the MSC Chiara, on September 27, 1994.

MSC issued a bill of lading to I.L. Italy describing the cargo as "2,450 packages of skins tanned" and contained the disclaimer "shipper's load and count." The gross weight was listed as 7,623 kilograms.[3] The cargo reached Norfolk, Virginia, on October 16, 1994, and remained there until October 21, 1994. At that time, Marine Freight issued a bill of lading for overland carriage by truck from Norfolk to Randleman. The bill of lading described the contents as "2,450 CTNS tanned skins," and listed the weight as 7,623 kilograms.

On October 21, 1994, a Marine Freight driver and a guard from the Portsmouth Marine Terminal conducted a visual check of the seals on the container and found them to be intact. The Marine Freight driver moved the container to Marine Freight's storage lot in Portsmouth, Virginia, where it remained until October 24, 1994, when Marine Freight transported the container to Randleman. The container remained on the truck overnight while the driver slept in the cab. The next morning, an I.L. USA employee cut the seals and discovered that two pallets were missing from the container.

The second shipment consisted of tanned and dyed skins packed onto nineteen pallets and loaded into a forty-foot shipping container by I.L. Italy, and sealed with a steel bolt-type seal. On November 30, 1994, Zeta Systems transported the container from I.L. Italy's ware-

---

[2] An employee of I.L. Italy accompanied the truck driver in a separate vehicle from I.L. Italy's warehouse to the port of Naples.
[3] MSC transcribed the information from the bill of lading provided by Zeta Systems.

house to the port of Naples. As with the first shipment, MSC issued a bill of lading to I.L. Italy for carriage from Naples, to Norfolk, Virginia. The bill of lading described the cargo as"4,484 packages skins tanned" and contained the disclaimer "shipper's load and count." The gross weight was listed as 14,401 kilograms. On December 9, 1994, MSC loaded the container onto its ship, the Sextum. The container arrived in Norfolk on January 3, 1995. Marine Freight picked up the container on January 9, 1995, and issued a bill of lading for carriage overland by truck from Norfolk to Randleman. Again, a Marine Freight driver and a guard from the Portsmouth Marine Terminal, conducted a visual inspection of the seal on the container and found it to be intact. On the way to Randleman, the driver stopped at a truck stop for four and one-half hours and then slept overnight in the cab. The following morning, an I.L. USA employee cut the seal and discovered six pallets missing.

On appeal, Marine Freight asserts that the district court erred in finding Marine Freight liable for the loss of cargo. On cross-appeal, AIG asserts that the district court erred in not finding MSC also liable for the loss of cargo and in declining to award pre-judgment interest to AIG.

The record establishes that both containers were delivered intact to MSC in Naples and that somewhere between Naples and Randleman the containers were broken into and cargo stolen. [4] Because it cannot be established where the loss occurred, liability for the loss is determined by the burdens of proof and presumptions applicable to the various bills of lading issued by the carriers of the containers. Bills of lading for the carriage of "goods by sea to or from ports of the United States, in foreign trade" are governed by the Carriage of Goods by Sea Act ("COGSA"), 46 U.S.C.A. §§ 1300-1315 (West 1994 & Supp. 1997). Domestic bills of lading issued by common carriers transporting goods in interstate commerce are governed by the Carmack Amendment, 49 U.S.C. § 11707(a)(1) (1994). The bills of lading issued by MSC for the ocean segment of the shipments are governed by COGSA. These bills of lading terminated once the shipments reached Norfolk. See Reider v. Thompson , 339 U.S. 113, 116-

---

[4] Subsequent inspection of the seals from both shipments established that they were removed and reattached.

5

17 (1950). At that point, Marine Freight issued new bills of lading to cover the domestic overland segment of the shipments and are therefore governed by the Carmack Amendment.

Turning to Marine Freight's liability, a common carrier is liable for the loss of goods it carries unless it can prove that it was free from fault or negligence and that the loss was due to one of the excepted causes relieving the carrier of liability. See 46 U.S.C.A. § 11707(a)(1); Missouri Pac. Ry. v. Elmore & Stahl, 377 U.S. 134, 137 (1964). The excepted causes include: an act of God, the public enemy, the act of the shipper himself, public authority, or the inherent vice or nature of the goods. See Missouri Pac. Ry., 377 U.S. at 137. Under the Carmack Amendment, to establish a prima facie case for recovery against Marine Freight, AIG must prove: (1) that intact containers were delivered to Marine Freight and (2) that Marine Freight delivered less than intact containers to Randleman. Id. Once the prima facie case is established, the burden of proof shifts to the carrier to show that it was both free from negligence and that the damage to the cargo was due to one of the excepted causes. Id.

AIG presented evidence that Marine Freight received intact containers.[5] Upon receiving the containers, Marine Freight issued clean bills of lading specifying the gross weight of the containers. When a carrier issues a clean bill of lading for cargo open to inspection, whether or not the carrier does in fact inspect the cargo, it will be held liable for delivery of the cargo in good condition. See National Transp., Inc. v. Inn Foods, Inc., 827 F.2d 351, 354 (8th Cir. 1987) (citations omitted). Also, when a carrier issues a bill of lading declaring the gross weight of the container, regardless of whether the carrier actually weighs the container, it will be liable for receipt of that gross weight. See Westway Coffee Corp. v. M.V. Netuno, 675 F.2d 30, 32 (2d Cir. 1982) (under COGSA the weight listed on a bill

_____

[5] AIG asserts that it need not prove that intact containers were delivered to Marine Freight, because Marine Freight is liable under the "last carrier" rule. Under the "last carrier" rule, there is a presumption of liability upon the last carrier when a through bill of lading is issued. See The Madow Co. v. S.S. Liberty Exporter, 569 F.2d 1183, 1185-86 (2d Cir. 1978). However, the "last carrier" rule is not applicable in this case because a through bill of lading was not issued.

6

of lading is prima facie evidence of receipt of that weight). Thus, despite the fact that Marine Freight did not weigh the containers before issuing clean bills of lading, the first element of the prima facie case is established based on the clean bills of lading specifying the weight of the containers. Marine Freight asserts that the weight given by I.L. Italy may have been inaccurate. A weighing of the containers, however, would have established any discrepancies. Therefore, Marine Freight fails to establish a defense to this element of the prima facie case.

AIG also established the second element of the prima facie case for recovery. The evidence clearly showed that the containers arrived at I.L. USA less than intact. Thus, AIG established a prima facie case against Marine Freight, and Marine Freight failed to establish that the damages were caused by one of the recognized exceptions relieving the carrier of liability. See Missouri Pac. Ry. , 377 U.S. at 137. Accordingly, we find that the district court did not err in finding Marine Freight liable for the loss of cargo.

Turning to the liability of MSC, under COGSA, to establish a prima facie case for recovery against MSC, AIG must prove the following: (1) that intact containers were delivered to MSC and (2) that MSC delivered less than intact containers to Norfolk. See 46 U.S.C.A. § 1303(4); Bally, Inc. v. M.V. Zim Am., 22 F.3d 65, 68-69 (2d Cir. 1994); Cummins Sales & Serv., Inc. v. London & Overseas Ins. Co., 476 F.2d 498, 500 (5th Cir. 1973). Once the prima facie case is established, the burden shifts to the carrier to show that the loss falls within one of the exceptions set forth in COGSA. See 46 U.S.C.A. § 1304(2); Vana Trading Co. v. S.S. "Mette Skou", 556 F.2d 100, 105 (2d Cir. 1977). If an exception is shown, the burden returns to the shipper to show that there were concurrent causes of loss in the fault and neglect of the ocean carrier. Id.

AIG established the first part of the prima facie case for recovery under COGSA. There is prima facie evidence establishing that I.L. Italy delivered intact containers to MSC in Naples, Italy. MSC issued "clean" bills of lading upon receipt of the containers. The clean bills of lading covering the subject goods are sufficient proof of the cargos' good condition on receipt by the carrier to satisfy the plaintiff's burden of production. See 46 U.S.C.A. § 1303(3), (4).

However, AIG fails to establish that MSC delivered less than the intact containers to Norfolk. Though the evidence at trial established that the containers had been off-loaded at a foreign port, where they remained for an unspecified period of time before being re-loaded onto another MSC ship and transported to Norfolk, MSC presented evidence of its method of storing containers aboard its vessels. It stored the containers in such a way that theft would be virtually impossible while at sea. Though it could easily be inferred that the containers had been tampered with while in the foreign port, evidence showed that upon arrival in Norfolk, Marine Freight employees inspected the containers and found the seals to be intact. Thus, AIG failed to establish that MSC delivered less than intact containers and therefore, failed to establish a prima facie case for recovery against MSC. We therefore find that the district court did not err in determining that MSC was not liable for the loss of cargo.

AIG also asserts on cross-appeal that the district court erred in deciding not to award prejudgment interest. The denial of prejudgment interest is reviewed for abuse of discretion. See Coliseum Carthage Co. v. Rubbermaid Statesville, Inc., 975 F.2d 1022, 1026 (4th Cir. 1992). The district court denied the grant of prejudgment interest because it found Marine Freight disputed liability in good faith. In U.S. Fire Ins. Co. v. Allied Towing Corp., 966 F.2d 820 (4th Cir. 1992), we concluded that although awarding prejudgment interest in maritime cases is the general rule, a court may deny such an award if "peculiar circumstances" would make it inequitable. See U.S. Fire Ins. Co., 966 F.2d at 828. "[A] genuine dispute regarding liability" is a typical example of "peculiar circumstances." Id. at 828 n.14. Here, there was never an express determination that Marine Freight acted in a negligent manner or directly participated in the loss of the goods. Thus, Marine Freight presented a genuine dispute regarding liability, and the district court did not abuse its discretion in denying prejudgment interest.

For these reasons, we affirm the district court's order.

AFFIRMED

8